IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| GARY YOKOYAMA, attorney-in-fact for Leatrice C. Yokoyama, individually and on behalf of a Class of Similarly Situated Persons,<br><br>        Plaintiffs,<br><br>   vs.<br><br>MIDLAND NATIONAL LIFE INSURANCE COMPANY,<br>              Defendant. | Case No. CV#05-00303 JMS KSC<br><br>**MEMORANDUM IN SUPPORT OF MOTION** |

**MEMORANDUM IN SUPPORT OF MOTION**

## TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   CLASS DEFINITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.  SUMMARY OF COMMON FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.   THE EXISTENCE AND NATURE OF MIDLAND'S UNFAIR AND
           DECEPTIVE PRACTICES WILL BE ESTABLISHED THROUGH
           CLASS-WIDE PROOF  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

           1.   Midland Misrepresents That There Are No Charges And That
                The "Entire Premium" Is At Work . . . . . . . . . . . . . . . . . . . . . . 7

           2.   Midland Keeps the Investors In the Dark About the Up Front
                Loss of their Principal By Making the Contract Provisions
                Arcane and Impenetrable  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

           3.   The Seniors' Principal is at Risk and the So-Called Guarantees
                are Virtually Worthless   . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

           4.   Midland Reserves the Right to Ratchet Down Interest and Cap
                Rates and to Increase Margin Indexes  . . . . . . . . . . . . . . . . . . 17

      B.   DAMAGES ARE ALSO SUSCEPTIBLE TO CLASS WIDE
           PROOF AND COMPRISE NUMEROUS COMMON ISSUES . . . 18

IV.   THE REQUIREMENTS OF FRCP RULE 23(a) ARE READILY MET  . 18

      A.   NUMEROSITY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      B.   COMMONALITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

           1.   Plaintiff And The Proposed Class Of Hawaii Senior Midland
                EIA Purchasers Share Common Issues of Law and Fact . . . . 20

      C.   TYPICALITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      D.   ADEQUATE REPRESENTATION . . . . . . . . . . . . . . . . . . . . . . . . 24

V.   THE REQUIREMENTS OF FRCP RULE 23(B)(3) ARE READILY
     MET . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

     A.   THE PROPOSED CLASS ACTION SATISFIES RULE
          23(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

     B.   PLAINTIFFS' CLAIMS ARE MANAGEABLE AS A CLASS
          ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

          1.   Class Members Have Little Interest in Pursuing Individual
               Actions Against Midland . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

          2.   The Lack of Pending Individual Suits Against Midland
               Demonstrates the Superiority of the Class Action Device . . 34

VI.  CLASS NOTICE IS WARRANTED UPON CERTIFICATION . . . . . . . 34

VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# TABLE OF AUTHORITIES

## CASES

*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*,
106 F.3d 11, 17-18 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Arkansas Ed. Ass'n v. Board of Ed. of Portland*,
446 F.2d 763, 765 (8th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Ashe v. Board of Elections*,
124 F.R.D. 45 (E.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Bates v. United Parcel Service*,
204 F.R.D. 440, 444 (N.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Blackie v. Barrack*,
524 F.2d 891, 901 n.17 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Bowling v. Pfizer, Inc.*,
143 F.R.D. 141 (S.D. Ohio 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Buchholtz v. Swift & Co.*,
62 F.R.D. 581 (D. Minn. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 28

*Chun v. Board of Trustees of Employees' Retirement System*,
92 Haw. 432, 992 P.2d 127 (Hawaii 2000) . . . . . . . . . . . . . . . . . . . . . . . . 35

*County of Los Angeles v. Jordan*,
459 U.S. 810, 103 S.Ct. 35, 74 L.Ed.2d 48 (1982) . . . . . . . . . . . . . . . . . . 19

*Dura-Bilt Corp. v. Chase Manhattan Corp.*,
89 F.R.D. 87, 93 (S.D.N.Y. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Eisen v. Carlisle and Jacquelin*,
417 U.S. 156, 177, 94 S. Ct. 2140, 2152, 40 L.Ed.2d 732 (1974) . . . . . . . . 6

*Esplin v. Hirschi*,
402 F.2d 94, 99 (10th Cir. 1968), *cert. denied*,
394 U.S. 928, 89 S. Ct. 1194, 22 L.Ed.2d 459 (1969) . . . . . . . . . . . . . . . . 32

# TABLE OF AUTHORITIES

*Fidelis Corp. v. Litton Indus., Inc.,*
    293 F. Supp. 164 (S.D.N.Y. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011, 1019 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 20, 23, 25

*Hanrahan v. Britt,*
    174 F.R.D. 356, 365-66 (E.D. Pa. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Harris v. General Dev. Corp.*,
    127 F.R.D. 655 (N.D. Ill. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Asbestos School Litig.,*
    104 F.R.D. 422 (E.D. Pa. 1984), *aff'd in part, vacated in part*,
    789 F.2d 996 (3d Cir. 1986), *cert denied*,
    479 U.S. 915, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986) . . . . . . . . . . . . . . . . . 21

*In re Gap Stores Sec. Litig.,*
    79 F.R.D. 283, 302 (N.D. Cal. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Gympsum Antitrust Cases*,
    565 F.2d 1123 (9th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*In re Heritage Bond Litig.*,
    No. 01-ML-1475 DT, 2004 U.S. WL 1638201
    (C.D. Cal. July 12, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 33

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493, 528 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Nissan Motor Corp. Antitrust Litigation*,
    552 F.2d 1088 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,*
    148 F.3d 283, 314 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

*In re Prudential Ins. Co. of Am. Sales Practices Litig.* ,
  962 F. Supp. 450 (D. N.J. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30, 34

*In re Sugar Indus. Antitrust Litig.* ,
  73 F.R.D. 322, 358 (E.D. Pa. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re THQ, Inc. Secs. Litig.* ,
  2002 WL 1832145 (C.D. Cal. Mar. 22, 2002) . . . . . . . . . . . . . . 7, 20, 23, 25

*In re Unioil Sec. Litg.* ,
  107 F.R.D. 615, 618 (C.D. Cal 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Workers' Compensation,*
  130 F.R.D. 99, 110 (D. Minn. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Jenkins v. Raymark Industries,*
  792 F.2d 468 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

*Jordan v. County of Los Angeles* ,
  669 F.2d 1311 (9th Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Joseph v. General Motors Corp.* ,
  109 F.R.D. 635 (D. Colo. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Klay v. Humana, Inc.,*
  382 F.3d 1241 (11th Cir. 2004), cert. denied,
  543 U.S. 1081, 125 S. Ct. 877, 160 L.Ed.2d 825 (2005) . . . . . . . . . . . . . . 32

*Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands* ,
  244 F.3d 1152 (9th Cir. 2001), cert. denied, 534 U.S. 973,
  122 S.Ct. 395, 151 L.Ed.2d 299 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Life of the Land v. Burns,*
  59 Haw. 244, 254, 580 P.2d 405, 411 (1978) . . . . . . . . . . . . . . . . . . . . . . . 19

*Malby v. General Electrical Credit Corp.* ,
  61 F.R.D. 59 (N.D. Ohio 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# TABLE OF AUTHORITIES

*Mamula v. Satralloy, Inc.,*
   578 F. Supp. 563 (S.D. Ohio 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Molina v. Mallah Organization, Inc.,*
   144 FRD 37, 41 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24, 28

*Montalvo v. Chang,*
   64 Haw. 345, 358, 641 P.2d 1321, 1331 (1982) . . . . . . . . . . . . . . . . . . . . . 35

*Ouellette v. International Paper Co.,*
   86 F.R.D. 476 (D. Vt. 1980 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Pace v. Honolulu Disposal Serv.,*
   277 F.3d 1150 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Philadelphia Electric Co. v. Anaconda American Brass Co.,*
   43 F.R.D. 452 (E.D. Pa. 1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Roper v. Consurve, Inc.,*
   578 F.2d 1106, 1112 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Satchell v. FedEx Corp.,*
   2005 WL 2397522 (N.D. Cal. Sept. 28, 2005) . . . . . . . . . . . . . . . . . . . . . . . 6

*Sosna v. Iowa,*
   419 U.S. 393, 403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) . . . . . . . . . . . . 25

*Specialty Cabinets & Fixtures v. American Equitable Life Ins.,*
   140 F.R.D. 474, 476 (S.D. Ga 1991) . . . . . . . . . . . . . . . . . . . . . . . 22, 26, 28

*Spencer v. Standard Chemicals & Metals Corp.,*
   143 N.E. 65 (1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Technograph Printed Circuits, Ltd. v. Methode Elecs., Inc.,*
   285 F. Supp. 714, 724-25 (N.D. Ill. 1968) . . . . . . . . . . . . . . . . . . . . . . . . 32

# TABLE OF AUTHORITIES

*Thomas v. Baca*,
   231 F.R.D. 397, 399 (C.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Von Collin v. County of Ventura*,
   189 F.R.D. 583, 591 (C.D. Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Weiss v. York Hosp.*,
   745 F.2d 786, 807-08 (3d Cir. 1984), *cert. denied*,
   470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985) . . . . . . . . . . . . . . 19

*Westways World Travel, Inc. v. AMR Corp.*,
   218 F.R.D. 223, 235 (C.D. Cal. 2003)235 . . . . . . . . . . . . . . . . . . . . . . . . . 23

## RULES

Fed. R. Civ. P. Rule 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Fed. R. Civ. P. Rule 23(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26, 27
Fed. R. Civ. P. Rule 23(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Fed. R. Civ. P. Rule 23(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Fed. R. Civ. P. Rule 23(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
Fed. R. Civ. P. Rule 23(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Fed. R. Civ. P. Rule 23(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28
Fed. R. Civ. P. Rule 23(b)(3) . . . . . . . . . . . . . . . . . . . . . . . 26, 28, 29, 31, 38
Fed. R. Civ. P. Rule 23(b)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Fed. R. Civ. P. Rule 23(b)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 34
Fed. R. Civ. P. Rule 23(b)(3)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Fed. R. Civ. P. Rule 23(b)(3)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28
HRCP Rule 23(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

# TABLE OF AUTHORITIES

## STATUTES

HRS Section 480-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
HRS Section 480-13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
HRS Section 480-24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## TREATISE

Newberg on Class Actions, §3.5 at 233-234 (4th ed. 2002) . . . . . . . . . . . . . . . . 19
Newberg on Class Actions § 3.10. pp. 3-49. 3-50 (3d ed. 1992) . . . . . . . . . . . . 21
Newberg on Class Actions, § 3.10, at 154 (2d ed. 1985) . . . . . . . . . . . . . . . . . . 22
Newberg on Class Actions, § 4.01, at 270 (3d ed. 1992) . . . . . . . . . . . . . . . . . . 28
Newberg on Class Actions §4.32 at 269 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Newberg on Class Actions § 4.32, at 4-125 (3d Ed. 1992) . . . . . . . . . . . . . . . . 32
Newberg on Class Actions, § 8:9 at 192 (4th ed. 2002) . . . . . . . . . . . . . . . . . . . 36
Newberg on Class Actions, § 8:37 at 276 (3d ed. 1992) . . . . . . . . . . . . . . . . . . . 37
Newberg on Class Actions § 17 at 17-48 (3d.ed. 1992) . . . . . . . . . . . . . . . . . . . 29
Wright, Miller & Kane, *Federal Practice and Procedure*,
Civ. 2d, Section 1175 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## I.    **INTRODUCTION**.

This class action case challenges an unfair and deceptive scheme

perpetrated by Defendant Midland National Life Insurance Company ("Midland"

or "Defendant").[1]  Sales to seniors (persons aged 65 and over) account for a major

portion of Midland's equity-indexed annuity ("EIA") business.  In Hawaii, over

900 of Midland's EIA deferred annuities were sold to seniors, approximately 30%

of the total sold in the State during the period from February 2000 to October

2006.  Declaration of James J. Bickerton in Support of Class Certification

("Bickerton Decl." or "Bickerton Declaration"), ¶ 9.  Midland even sold deferred

annuities to purchasers who were aged 80 to 88.  *Id.* at ¶ 12.  Elderly citizens are a

major target of the deferred annuities industry because they control a huge portion

of this country's wealth and are vulnerable to the sales materials and

representations that Midland has formulated and directed from its national

headquarters.

Midland's sales brochures promised seniors that Midland's deferred EIAs

provided competitive, tax-advantaged returns without up-front sales charges or

any risk of loss.  The brochures concealed from the consumers the hefty

commissions that were being subtracted from their premium and being paid to

---

[1]Deferred annuities are essentially investment contracts issued by Midland that are not registered securities with the SEC.  They include fixed deferred annuities and equity-indexed annuities (also known as "EIA's").  These products are described in the Declaration of Craig J. McCann, Ph.D., C.F.A., ("McCann Decl."), attached hereto.

salesmen the day they bought the annuity.  Indeed, brochures used with Hawaii seniors told consumers that "since there are **no** initial sales charges or fees, your **entire** premium is working for you, **immediately** earning tax-deferred interest." (Emphasis added.)  *See* Exhibits 12, 14, 16, 20, 24, and 32.

In fact, contrary to the portrayal of the Midland annuities in the sales materials, the Midland annuities were doomed at inception by large undisclosed sales commissions paid to agents and up-front profits pocketed by Midland at the time of sale.  This opening move by Midland -- inducing consumers to buy the EIAs by concealing the sales charges and leading consumers to believe that they have 100% "participation" in index-linked growth -- leaves Midland in a bind because the reality is that Midland immediately takes 20 cents or more out of each dollar for sales commissions and profits.

To then make it appear as if 100 cents rather than 80 cents is at work, while also giving some effect to its promises of "security" combined with 100% stock market "participation" with "guarantees" that will "protect and maximize your retirement dollars" (all words used in Midland's sales brochures),  Midland has built into each contract a complex web of surrender periods, surrender charges, interest adjustments and caps and spreads on the index increases.  These are so poorly disclosed and so hidden behind abstruse formulas that the consumer is deceived a second time -- he cannot see where his funds have gone and he cannot

2

compare his "investment" to other investments.

The net result of these twin deceptions is to leave the consumer unaware that he has given away a large portion of his funds and only 80 cents out of each dollar is actually working for him when he could have chosen an alternative investment that would have had nearly 100 cents out of each dollar working for him.

Perversely, once seniors are convinced by Midland's agents to move retirement assets into deferred annuities, their assets are frozen by surrender periods and penalties extending years into the future, in many cases longer than elderly Class Members are likely to live. These are made necessary because it takes years for the 80 cents to grow back into the 100 cents that Midland has "guaranteed" the consumers will always have.

To the extent that the Midland annuities set forth schedules of ostensibly applicable surrender charges, these provisions deceptively understate the true magnitude and risk of the surrender charges. The annuity contracts' provisions include a Byzantine maze of indecipherable terms and provisions that deceptively impose additional charges that not even Ph.D. economists and doctorates in business administration could understand without hours of careful scrutiny.

Because Midland misrepresents or intentionally fails to disclose material facts concerning its deferred annuities that competing registered investment

3

products are required to disclose (including its commissions, sales loads and expenses, truthful historical or projected investment yields, investment risks and other information), no Class Member can even begin to appreciate the true costs, risks and poor financial returns of these investment products in order to make an informed purchase decision.

Plaintiffs' two experts -- Craig McCann, Ph.D., C.F.A. (a former SEC financial economist) and Thomas J. Maronick, DBA, J.D. (the former Director of the Office of Impact Evaluation in the Bureau of Consumer Protection of the FTC) -- confirm that Midland withholds critical information from all Class Members.

Through sophisticated computer modeling (a resource that is not available to elderly Class Members or even to Midland agents), Dr. McCann has determined that Class Members purchasing a Midland equity-index annuity receive an *investment worth only $70 to $80 for each $100 invested with Midland.* In the words of Plaintiffs' marketing expert, Midland's brochures and contracts are likely to mislead extremely vulnerable senior consumers in a material way and, therefore are deceptive. Declaration of Thomas J. Maronick, ¶ ¶8, 19, 22 ("Maronick Decl."); *see also* McCann Decl., ¶18.

Plaintiffs and Class Members have been systematically deceived into transferring more than $32 million into Midland annuities -- and thus more than $6 million in commissions and profits into the pockets of Midland and its agents --

4

while having their life savings locked up in illiquid, poorly-performing annuities that they could not understand and do not need. *See* Bickerton Declaration at ¶ 12; Ex. 9. In fact, if Class Members had put their money in a simple mutual fund they would have been much better off. McCann Decl., ¶21. Certification of the class proposed by Plaintiffs offers the best and only effective remedy for these elderly Class Members.

## II.  **CLASS DEFINITION.**

Plaintiffs GARY YOKOYAMA, attorney-in-fact for Leatrice C. Yokoyama; CATHERINE E. THORSON; and EDNA C. YAMANE, by her attorney-in-fact Kathleen Maeda, on behalf of themselves and other senior citizens in the State of Hawaii, through their counsel, move pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, for certification of a class in this action as follows:

> [A]ll persons residing in Hawaii who from May 3, 2001 to the May 3, 2005 date of the filing of the Complaint herein (the "Class Period"), and while age 65 years or older, purchased a Midland EIA either directly or through the surrender (whole or part) of an existing permanent life insurance policy or annuity, or by borrowing against an existing permanent life insurance policy, which annuity had a rate of return dictated by a specific market "index."

The class period is determined by the applicable statute of limitations: four years prior to the May 3, 2005 date of filing suit. All of Plaintiffs' claims arise under (Hawaii Revised Statutes) Sections 480-2 and 480-13. Section 480-24

provides for a four years statute of limitations for such claims.

While persons who only purchased before May 5, 2001 may have a claim for tolling of the limitations period based on "continuing violation" or "non-disclosure" under Section 480-24, they are not included within the proposed class contemplated by this motion.

Plaintiffs, and through them all senior citizens in Hawaii affected by Midland's conduct in the class period, bring this action against Midland to challenge Midland's practice of selling senior citizens in Hawaii EIAs that purport to provide seniors with security and asset growth but in fact do neither, and achieving the sales by misrepresenting or concealing cost and risk information or making its disclosures so complex and obscure as to amount to a concealment.

## III.   **SUMMARY OF COMMON FACTS**

In deciding class certification, the Court does not not reach the merits and is bound to accept all non-conclusory factual allegations of the complaint as true. [2]

However, the Court may look beyond the pleadings to satisfy itself that there is

---

[2]*See Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 177, 94 S. Ct. 2140, 2152, 40 L.Ed.2d 732 (1974); *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975) (explaining that "court is bound to take substantive allegations of the complaint as true" at class certification state); *Thomas v. Baca*, 231 F.R.D. 397, 399 (C.D. Cal. 2005) ("In evaluating a motion for class certification, '[t]he court is bound to take the substantive allegations of the complaint as true.'") (quoting *In re Unioil Sec. Litg.*, 107 F.R.D. 615, 618 (C.D. Cal 1985)); *Satchell v. FedEx Corp.,* No. C03-02659, 2005 WL 2397522, *4 (N.D. Cal.Sept. 28, 2005) ("The Court is obliged to accept as true the substantive allegations made in the complaint.").

sufficient information to reach a "reasonable judgment" on the requirements of

Rule 23.[3]  Although this case is in the initial discovery phase, Plaintiffs have

already developed an ample factual record supporting class certification under

controlling legal standards.

A.  **THE EXISTENCE AND NATURE OF MIDLAND'S UNFAIR AND DECEPTIVE PRACTICES WILL BE ESTABLISHED THROUGH CLASS-WIDE PROOF**

1.  **Midland Misrepresents That There Are No Charges And That The "Entire Premium" Is At Work**

At the heart of this case is the following central fact, described succinctly in

the declaration of one Plaintiffs' experts, Dr. Craig McCann:

> The value of $100 invested in Midland's EIAs, including the value of any guarantee, was between $70 and $85 at the time of purchase.  It is impossible, based on the documents I have reviewed for an investor or a salesperson to understand that a $100 is buying only $70 worth of investment with the remainder going to the costs and profits of the industry and its agents.  The information necessary for an investor or salesperson to understand the actual value of the investment was not disclosed by Midland; in fact, it is concealed by and misrepresented by statements in Midland's sales brochures that: (1) "Since there are no initial sales charges or fees, your entire premium is working for you, immediately earning tax-deferred interest," and (2) the annuity "contains guarantees that . . . maximize your retirement dollars."

---

[3]*In re Heritage Bond Litig.*, No. 01-ML-1475 DT, 2004 WL 1638201 *8 (C.D. Cal. July 12, 2004); *In re THQ, Inc. Secs. Litig.*, No. CV00-1783 AMH, 2002 U.S. Dist. LEXIS 7753, *7 (C.D. Cal. Mar. 22, 2002).

McCann Decl., ¶20.

How do Plaintiffs establish that this scheme is common to all members of the proposed Class? Through the testimony of Midland's own FRCP Rule 30(b)(6) designee, Robert Tekolste. According to Tekolste, Midland's agents are instructed not to deviate from the limited information presented in Midland's standard form annuity contracts, the Annuity Disclosure and and uniform pre-printed product brochures for each contract form when making a sales presentation to prospective customers. *See* Deposition of Midland Rule 30(b)(6) designee, Robert Tekolste ("Tekolste Deposition") taken October 31, 2006, attached hereto as Exhibit "6-B") at pp. 57-58.

To tighten the link further, no consumer can buy an annuity unless he or she confirms that they have received these materials. Tekolste Deposition, Ex. 6 hereto, at pp. 57. Thus, by Midland's own admission, the product is sold through standard pre-printed forms that *each* consumer receives.

Tekolste testifies that when a contract is first sold, 9% to 10% of the premium paid (i.e. the total amount invested by the consumer) is paid over to the sales agent as commissions. This figure may actually siginificantly understate the commission paid to the sales agent. Daniel Doi, one of the leading producers for Midland in Hawaii testified at his deposition that he sold Midland's "Direct 16" EIA (a product purchased by 38% of the proposed Class as reflected in Ex. 9

8

hereto and thus Midland's largest seller in Hawaii) because it paid higher commissions than the annuities of other companies and that he received 16% to 18% of the premium as his commission. However, whether the consumer's nest egg is tapped for 9% or 16% of its total value, there is no doubt that these are huge sales charges. While the commission may vary from consumer to consumer, all are subjected to these commissions which are far higher than any other investment product on the market and, more importantly, each consumer is deceived in the same way about the existence of those commissions.

Taking such large commissions would not be inherently deceptive (though it would still be "unfair" within the meaning of HRS Chapter 480) if it was disclosed to the consumer up front. However, as Dr. McCann notes, no rational consumer would buy the Midland EIAs if they were aware how much money was being taken out of their funds up front. McCann Decl., ¶¶17(c), 20 and 42. Thus, the hefty commissions are **not** disclosed. Worse, as explained below, Midland conceals them by a combination of silence, half truths, misdirection and outright misrepresentations.

The commissions are only the first cut. As Dr. McCann explains, a sophisticated knowledge of the annuities business that cannot be derived from reading the sales material or the contract, reveals that the annuity company also takes its profits out of the initial premium. McCann Decl., ¶20-23. While a

9

company is not usually under an obligation to reveal its profits on a product,
where the product is a promise to "protect and maximize" the customer's funds
and is sold with assurances of "guaranteed" "100% participation," disclosure of
the bite taken out up front by Midland becomes necessary to make the sales
presentation not be deceptive and misleadling.

Midland's scheme to conceal the existence of the hefty commissions has
several parts. First, Midland does not even disclose **the existence** of the
commissions in the written materials, let alone their amounts. *See* Exhibits 11-36.
Second, Midland can count on the self-interest of its agents not to tell customers
that the sales force will be writing themselves a large check out of the customer's
hard-earned funds as soon as the customer gives them the funds to invest. Thus,
there is little likelihood that the consumers will learn of the charges from the
written (or oral) sales presentation.

Third, Midland's pre-printed sales materials are written in a way to conceal
the commissions. The contract forms and brochures uniformly tell the consumer
brochures that they will have "100% participation" in the pool of money linked to
the stock market index. What it really means is that 100% of the 80 cents
remaining out of each dollar invested will participate, but seniors will readily
assume that "100% participation" means that all of their premium is at work. The
brochures reinforce this impression by telling the consumers that Midland's

10

"guarantees" will "protect and maximize your retirement dollars." *See*, *e.g.*, Ex. 12 at bates number MNLY009872, 14 at bates number MNLOY009094, and Exhibit 16 at bates number MNLY009626.

Although commissions are not mentioned, consumers are actively led to believe there are none. As an example, brochures relating to at least 6 of the 13 contract forms used in Hawaii (including 2 of the 3 largest sellers, "Direct 16" and "Bonus 5") state:

> Since there are **no** initial sales charges or fees, your **entire** premium is working for you, **immediately** earning tax-deferred interest.

(Emphasis added.) . *See* Exhibit 22 at Bates Number MNLY001712, Exhibit 24 at bates number MNLY001979. Midland may now argue that a commission is not "an initial sales charge," but few consumers – or jurors – would understand that fine distinction. More to the point, the brochures have "the capacity to deceive" consumers into believing that there are no commissions or other charges or fees that would serve to reduce the amount of their principal that will be put to work.

The gravamen of the unfair and deceptive act is the concealment of a material feature of the EIA – that large up front commissions will severely hamstring the earning capacity of the consumer's funds for the life of the annuity. This concealment is class-wide and common to each and every member of the proposed class.

11

Having inveigled the consumer's funds by concealing the up front bite, Midland must now deal with the promise it makes to every member of the proposed class that its "guarantees" will "protect" the consumer's funds and ensure that the principal never goes below the original premium. This feature means a lot to the average senior consumer, who is worried about the possibility of capital loss and is buying this product to avoid it. Maronick Decl., ¶¶13-14. How does Midland convince the consumer that his or her funds are still there when such a large percentage has already been dissipated in commissions and profits? By making sure that if the consumer wants to take his money out before the 80 cents has grown back to 100 cents, he or she will have to forfeit "surrender" charges. While the existence and amount of the surrender charges is usually disclosed to some extent, their real function is to conceal the fact that part of the consumer's money is gone. Thus, the original concealment is reinforced and continued.

**2.    Midland Keeps the Investors In the Dark About the Up Front Loss of their Principal By Making the Contract Provisions Arcane and Impenetrable.**

Midland must also keep the returns lower than any other competing investment, because only 80 cents has gone to work, and the 80 cents is incapable of generating the return that 100 cents would have generated. Again, Midland faces the problem: if consumers were told how this product actually operated and,

12

in particular how low the returns on their original investment were in comparison to other financial products (as discussed in detail in the attached Declaration of Dr. McCann), they simply would not buy the product. Midland solves the problem by using interest rate calculation formulas and terms in its contracts and brochures that make it impossible for the ordinary consumer to understand the real rate of return or to compare it to any other product.

As one example, while telling the consumer that they have 100% participation, they clip the return by subtracting an "Index Margin". The existence of an "Index Margin" is mentioned in all of the materials, but the consumers are merely told in the brochures that once their "gain" has been calculated, an Index Margin is subtracted. The Index Margin is defined as a percentage (e.g. 4% or 5%), leaving consumers to think that their gain is reduced by a small percentage, such as 4% or 5%. In fact, it is their *percentage* gain that is reduced, so a 7% gain is reduced to a 2% gain by a 5% Index Margin and Midland takes more than half of the appreciation resulting from the stock market rise. When one considers that the stock market has historically averaged only 11% gains per year, one can see how significant the Index Margin is.

This ambiguity appears deliberate as it arises again in the contract language itself. Section 5.2 of the Midland contracts calls for the index gain to be calculated as a decimal number and then says that this number will be "less the Index

13

Margin" (expressed as a percentage), with the result then multiplied by the

Participation rate (another percentage).  Any senior consumer trying to understand

the Index Margin from the written form would probably have even more difficulty

than Mr. Tekolste did in trying to figure out how to do this calculation.   Tekolste

Deposition (Ex. 6) at Vol II, pp. 19-22.

An even more complex formula is used to conceal a hidden surrender

charge that is in addition to the disclosed surrender charges.  The contract forms in

Paragraph 6.2 all note that the Surrender Value (what the consumer gets back if he

asks for his money during the surrender period, which can be up to 15 years) is the

Accumulation Value reduced by the Surrender Charge.  However, before the

Accumulation Value is reduced by the Surrender Charge, it is first multiplied by

an "Interest Adjustment" which is a number always less than 1 if Midland has not

reduced its annuity interest rates since issuance.   To obscure that this number is

more often than not less than 1 (and thus serves to reduce the Accumulation Value

even before the Surrender Charge is deducted), Midland uses the following

impenetrable formula:

Interest Adjustment factor $= [1(1+I_o - .005)/(1+I_0{}^{\wedge}T]$

where "$I_o$ = The current interest rate (excluding any additional interest) when this

Certificate was issued" ( Note: a non sequitur in itself since a past event cannot be

"current")

15

and "$I_t$ = The current interest rate (excluding any additional interest) offered for new Certificates"

and "T=Time in years as follows:

> Number of days from the date of the partial or full surrender to the end of the current Certificate Year divided by 365; plus whole number of years remaining in the Surrender Period."

The operation $^\wedge T$ presumably mains "raised to the power T" so that the Interest Adjustment is an even smaller number if the surrender occurs in the first year when T is large and interest rates are likely unchanged, while $I_o$ and $I_t$ are presumably expressed as decimals (though again, the formula is obscure). The central point is that this is the type of formula that a senior consumer would have to wade through to ever arrive at clear picture of the risk and return of this instrument.

The problem is that the formulas are designed to be obscure and completely opaque and thus deceptive, and this tendency to deceive is one common to all members of the class since the same terms, formulas and degrees of complexity exist in every one of the Midland contract forms.

### 3. The Seniors' Principal is at Risk and the So-Called Guarantees are Virtually Worthless

Midland's brochures emphasizes that its annuities "guarantee" that purchasers will not lose any portion of their principal investment. However, as a

result of the complex interplay between surrender charges, undisclosed additional surrender penalties and annuitization provisions, seniors actually incur the risk that they will not receive back their principal amount upon surrender. McCann Decl., ¶¶24-31. The so-called principal guarantee is virtually worthless. If a senior were to purchase a high quality bond or bond fund rather than an Midland annuity, he would be guaranteed to receive back his principal plus a guaranteed return. McCann Decl., ¶ 25.

All consumers receive the same promises of avoiding market risk, downside protection, and market participation. And, as the analysis in the attached declaration of Dr. McCann show, these promises are false and misleading since al of the consumers' funds are at market risk, have a downside, and do not participate in much of the market's rise.

### 4.    Midland Reserves the Right to Ratchet Down Interest and Cap Rates and to Increase Margin Indexes

Midland's brochures sell deferred annuities to seniors with the lure of ostensibly favorable interest rates (for fixed annuities) and the prospect to share in S&P gains through participation rates (for equity-indexed annuities). Midland does not meaningfully disclose or explain , however, that it has the arbitrary power to set the various interest rates, rate caps and index margins at any number it chooses up to the stated maximum or minimum. Thus, the consumer is at risk -- an unknown and uncontrollable risk -- that returns will go down as Midland's

17

need or greed goes up, without regard to what is happening in the market.

Again, this problem is intrinsic to the product, is the same in each of the 13 different contract forms (although the precise percentage of index margins, cap rates and interest rates varies from product to product and year to year.)  Thus, it is an issue common to the class.

### B.   DAMAGES ARE ALSO SUSCEPTIBLE TO CLASS WIDE PROOF AND COMPRISE NUMEROUS COMMON ISSUES.

As shown above, the proof of the unfair and deceptive acts ("UDAP") under HRS Section 480-2 involve common proof applicable to all members of the class. Moreover, as Dr. McCann's declaration shows, damages are subject to calculation by common methods.  *See* McCann Decl. at ¶¶ 34-41.  In short, a case that involves a common scheme or practice applied to a similarly situated group of persons which causes the same basic harm to all of them (loss of investment value) is a classic example of a case suitable for resolution as a class action.

## IV.   THE REQUIREMENTS OF FRCP RULE 23(a) ARE READILY MET.

Rule 23(a) sets four requirements for class certification, namely: (1) numerosity, (2) commonality, (3) typicality and (4) adequacy of representation.

### A.   NUMEROSITY.

Numerosity is satisfied if "the class is so large that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, the requirement is met because it is difficult or inconvenient to join all members of the proposed classes.  *Jordan v.*

18

*County of L.A.*, 669 F.2d 1311, 1319 (9th Cir.), *vacated on other grounds*, 459

U.S. 810, 103 S.Ct. 35, 74 L. Ed. 2d 48 (1982).  Importantly, "Plaintiffs do not

need to state the exact number of potential class members, nor is a specific number

of class members required for numerosity." *Bates v. United Parcel Service,* 204

F.R.D. 440, 444 (N.D. Cal. 2001).  *See generally* Herber Newberg & Alan Conte,

*Newberg on Class Actions,* § 3.5 at 233-234 (4th ed. 2002) ("*Newberg*") ("In light

of prevailing precedent, the difficulty inherent in joining as few as 40 Class

Members should raise a presumption that joinder is impracticable, and the Plaintiff

whose class is that large or larger should meet the test of Rule 23(a)(1) on that fact

alone.").

In this case, there are approximately 624 potential class members.  *See*

Declaration of James J. Bickerton at ¶ 12; *see also* Exhibit 9.  Classes with as few

as 35 known members have been certified.  *See Weiss v. York Hosp.*, 745 F.2d

786, 807-08 (3d Cir. 1984), *cert. denied*, 470 U.S. 1060 (1985) (92 members); *In*

*Re Gap Stores Sec. Litigation,* 79 F.R.D. 283, 302 (N.D. Cal. 1978) (91 members);

*Fidelis Corp. v. Litton Indus., Inc.,* 293 F. Supp. 164 (S.D.N.Y. 1968) (35

members); *Arkansas Ed. Ass'n v. Board of Ed. of Portland*, 446 F.2d 763, 765 (8th

Cir. 1971) (fewer than two dozen).  In Hawaii, the numerosity requirement has

been satisfied with as few as thirteen potential class members.  *Life of the Land v.*

*Burns,* 59 Haw. 244, 254, 580 P.2d 405, 411 (1978).  Accordingly, the numerosity

requirement easily is satisfied.

## B.   COMMONALITY.

Commonality is established "if there are questions of law or fact common to the class." Fed. R. Civ. P. 23 (a)(2).  The commonality requirement is construed "permissively."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) ("All questions of fact and law need not be common to satisfy the rule.").  The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.  *Id.; In re THQ Inc. Secs. Litig.,* 2002 WL 1832145 (C.D. Cal. Mar. 22, 2002).

> **1.    Plaintiff And The Proposed Class Of Hawaii Senior Midland EIA Purchasers Share Common Issues of Law and Fact.**

Where allegations of wrongdoing involve a common class-wide practice, Class Members' claims necessarily involve common questions of law and fact. As the Third Circuit has observed, "[w]here many purchasers have been defrauded over time by similar misrepresentations, or by a common scheme to which alleged non-disclosures related, courts have found that the purchasers have a common interest in determining whether the defendant's course of conduct is actionable." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,*  148 F.3d 283, 314 (3d Cir. 1998).

"The test or standard for meeting the Rule 23(a)(2) prerequisite is qualitative rather than quantitative – that there need only be only a single issue common to all members of the Class. Therefore, this requirement is easily met in most cases." Newberg on Class Actions § 3.10. pp. 3-49. 3-50 (3d ed. 1992); *see also Harris v. General Dev. Corp.*, 127 F.R.D. 655 (N.D. Ill. 1989) (single issue common to all members of Class adequate to meet commonality requirement); *Ashe v. Board of Elections,* 124 F.R.D. 45 (E.D.N.Y. 1989) (racial discrimination issue common to all Class members); *Joseph v. General Motors Corp.*, 109 F.R.D. 635 (D. Colo. 1986) (defective engine design common to entire Class).

A question is considered common when it arises from a common nucleus of operative facts, even though underlying facts of the case may fluctuate over the entire class period and vary among the individual class members. *In re Asbestos School Litig.*, 104 F.R.D. 422 (E.D. Pa. 1984), *aff'd in part, vacated in part*, 789 F.2d 996 (3d Cir. 1986), *cert denied*, 479 U.S. 915, 107 S. Ct. 318, 93 L.Ed.2d 291 (1986); *Bowling v. Pfizer, Inc.,* 143 F.R.D. 141 (S.D. Ohio 1992) (Defendants' conduct arose out of singular nucleus of fact and law).

In this case, the common nucleus of operative facts described in Section III above plainly satisfies the Rule's test. The common questions arising out of these common facts fulfill the requirement of Rule 23(a)(2) because the Rule "does not require that all questions of law or fact raised in the litigation be common."

21

*Specialty Cabinets & Fixtures v. American Equitable* , 140 F.R.D. 474, 476 (S.D.

Ga. 1991). *See also Molina v. Mallah Organization, Inc.* , 144 FRD 37, 41

(S.D.N.Y. 1992) (the Court stated that "not every question of fact or law need be

common to every member of the class"); Newberg on Class Actions, § 3.10, at

154 (2d ed. 1985). "The threshold of commonality is not high. Aimed in part at

determining whether there is a need for combined treatment and a benefit to be

derived therefrom, the rule requires only that resolution of the common question

affect all or a substantial number of the class members." *Jenkins v. Raymark*

*Industries,* 782 F.2d 468 (5th Cir. 1986).

Plaintiffs and the Class Members share these additional common questions

of fact and law among others:

1. whether Midland's duty to avoid unfair and deceptive acts under HRS Chapter 480 require it to provide clear and accurate description of its annuities, including the inherent material disadvantages described above that make them unsuitable and/or inferior investments for seniors;

2. whether Midland has breached its statutory duty through its common marketing scheme of brochures and contracts by failing to disclose and actively concealing from Plaintiff and Class Members, material information concerning its expense ratios, commissions and other sales charges, costs of insurance, interest rate spreads and other underwriting assumptions that made its deferred annuities unsuitable for seniors and inherently inferior to other available investment products;

3. whether the "guarantee" of principal protection and absence of risk are deceptive under HRS Chapter 480;

22

4.      whether Midland's marketing materials contained false or misleading facts or omitted material facts in violation of HRS Chapter 480;

5.      whether Midland deceptively failed to disclose and explain the likelihood and risk of its exercising a right to ratchet down crediting rates such that its deferred annuities are unsuitable for seniors and inherently inferior to other available investment products;

6.      whether Plaintiffs and members of the Class have sustained damages as a result of Midland's wrongful conduct and, if so, what is the proper measure of such damages; and

7.      whether Plaintiffs and members of the Class are entitled to specific performance, injunctive relief, restitution, disgorgement or other equitable relief from Midland.

## C.   TYPICALITY.

Rule 23(a)(3) requires that the claims of the representative party be "typical" of the claims or defenses of the class.  Under the Rule's "permissive" standards, representative claims are "typical" if they are reasonably co-extensive with those of absent Class Members; they need not be substantially identical. *Hanlon*, 150 F.3d at 1020; *In re THQ*, 2002 U.S. Dist. LEXIS 7753 at *12. "Varying factual differences between the claims or defenses of the class and the class representative will not render the named representative's claim atypical." *Von Collin v. County of Ventura*, 189 F.R.D. 583, 591 (C.D. Cal. 1999).  *See generally Westways World Travel v. AMR Corp.*, 218 F.R.D. 223, 235 (C.D. Cal 2003).

Plaintiffs' claims and any defenses to such claims are typical of the other

23

members of the class. The typicality test is satisfied when the claims of the class representatives rest on the same legal and remedial theories as the claims of the class members. "The 'typicality' requirement focuses less on the relative strengths of the named and unnamed plaintiffs' cases than on the similarity of the legal and remedial theories behind their claims." *Jenkins*, 782 F.2d at 472. *See Buchholtz v. Swift & Co.*, 62 F.R.D. 581 (D. Minn. 1973) (In discussing the typicality requirement, the Court noted that Rule 23(a)(3) was satisfied "whenever there are co-extensive interests on the part of the representatives and class members or the absence of interests on the part of the representatives that are antagonistic to the interests of the absentees.")

In this case, the claims of the Plaintiffs and the potential class members rest on the same legal theories -- theories of unfair and deceptive trade practices. All members of the class stand to benefit from and undoubtedly would favor the relief requested from Midland that the named Plaintiffs seek to obtain. Consequently, the typicality criterion is satisfied because the claims of the class representatives "arise from the same . . . course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory." *Molina*, 144 F.R.D. at 41.

## D. ADEQUATE REPRESENTATION.

The final Rule 23(a) requirement is that "the representative parties will

24

fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

Resolution of two questions determines adequacy: (1) whether the named

plaintiffs and their counsel have any conflicts of interests with other Class

Members, and (2) will the named plaintiffs and their counsel prosecute the action

vigorously on behalf of the class. *Hanlon*, 150 F.3d at 1020; *In re THQ,* 2002

U.S. Dist. LEXIS 7753 at *20.

Here, the representative parties will fairly and adequately protect the

interests of the class. The interests of the representatives are coextensive and

wholly compatible with those of the class members. *See Sosna v. Iowa*, 419 U.S.

393, 403 (1975) (finding that the requirement of adequacy of representation was

met because the interests of the Plaintiffs did not conflict with those of the other

class members.) Plaintiffs are actively pursuing their claims on behalf of

themselves and the class as a whole, and are leading a true effort to receive relief

from and recompense for the damages wrongfully caused by Midland. Although

there are only a few representatives here, "adequacy of representation is largely a

matter of quality, not quantity." *Buchholtz*, 62 F.R.D. at 598 (the Court found that

two representatives adequately represented some 850-1,500 class members).

The Plaintiffs are able class representatives fully aware of their duties to the

class. *See* Declarations of Gary Yokoyama, attorney-in-fact for Leatrice C.

Yokoyama; Catherine E. Thorson; and Edna C. Yamane, by her attorney-in-fact

25

Kathleen Maeda.[4]   Furthermore, Plaintiffs' counsel are competent and will fairly and skillfully prosecute this action with vigor in behalf of all class members.  *See Specialty Cabinets & Fixtures v. Am. Equitable Life Ins.*, 140 F.R.D. 474, 476 (S.D. Ga. 1991)).

Plaintiffs' legal team combines the experience of two firms.  Gerald S. Clay and Scott Batterman of Clay Chapman Crumpton Iwamura & Pulice have a practice that emphasizes investor rights and breaches of duties by financial advisors. *See* Declaration of Gerald S. Clay.

James J. Bickerton and Barry A. Sullivan of Bickerton Saunders Dang & Sullivan ("BSDS") are experienced civil litigators with an emphasis on consumer class actions.  In just the last few years, BSDS was involved in a number of certified class actions, including *Pace v. Honolulu Disposal Service,* reported at 277 F.3d 1150 (9th Cir. 2000) before settling in the District Court of Hawaii.  *See* Declaration of James J. Bickerton.  Plaintiffs' counsel are experienced and capable.  The adequacy element is satisfied.

## V.   THE REQUIREMENTS OF FRCP RULE 23(B)(3) ARE READILY MET.

In addition to satisfying the requirements set forth by Rule 23(a), a party

---

[4]A power of attorney confers full authority on a party to prosecute a claim in the name of the person granting the power.  *See. e.g., Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 17-18 (2d Cir. 1997); *Spencer v. Standard Chemicals & Metals Corp.*, 143 N.E. 651, 237 N.Y. 479, 482 (1924).

seeking class certification must show that the action falls into one of the categories described in Rule 23(b).

## A.   THE PROPOSED CLASS ACTION SATISFIES RULE 23(b).

To be maintained as a class action, a suit must meet not only the prerequisites of Rule 23(a), but also additional requirements of one of the subdivisions of Rule 23(b). This case satisfies the requirements under all of the subcategories of 23(b). The elements of Rule 23(b)(1)(B) are satisfied. Plaintiffs' complaint would definitively determine the duties owed to the Plaintiffs, Midland's systemic breach of those duties, and whether the policy itself -- and the way it was presented -- was an unfair and deceptive trade practice. Any relief granted by a court to remedy the individual Plaintiffs' claims would thereby affect all other policyholders.

Classes under Rule 23(b)(2) are appropriate when injunctive relief is sought. *See* Wright, Miller & Kane, *Federal Practice and Procedure*, Civ. 2d, Section 1175. *See also Mamula v. Satralloy, Inc.,* 578 F. Supp. 563 (S.D. Ohio 1983) (Class action for injunction against employer by retired and laid-off employees to compel employer to provide benefits due under ERISA employee benefit plan). Among the relief sought, Plaintiffs are seeking injunctive relief enjoining the sale of Midland's equity-indexed annuities to senior citizens in Hawaii; and mandating modifications of the EIA policy.

27

These actions by Midland are generally applicable to the class, and thereby make injunctive relief appropriate with respect to the class as a whole.

Plaintiffs are also seeking damages and remedies that are just and proper, and therefore provision (b)(3) of Rule 23 will also be discussed. "Most suits that qualify as class actions under Rule 23(b)(1) or (b)(2) will also qualify under the more comprehensive Rule 23(b)(3)." *Specialty Cabinets and Fixtures,* 140 F.R.D. at 477. *See also* Newberg on Class Actions, § 4.01, at 270 (3d ed. 1992).

Rule 23(b)(3) permits class actions if common questions predominate over individual ones and a class action is superior to other available methods of adjudication. "The fundamental question is whether the group aspiring to class status is seeking to remedy a common legal grievance." *Buchholtz*, 62 F.R.D. at 598. That clearly is the situation here. "Courts generally focus on the liability issue in deciding whether the predominance issue is met." *Dura-Bilt Corp. v. Chase Manhattan, Corp.,* 89 F.R.D. 87, 93 (S.D.N.Y. 1981). "Just as 23(a)(2) does not require that all questions of law of fact be common, 23(b)(3) only requires that such questions predominate over individual ones." *Molina v. Mallah Org., Inc.,* 144 F.R.D. 37, 41 (S.D.N.Y. 1992).

As stated above, the threshold and overriding question is whether Midland's sales of EIA product to seniors, when the actual operation of the product is compared to what the senior consumer is led to believe by both representations

28

and omissions, is an unfair and deceptive trade practice. These threshold matters are common questions, partaking of no individual issues as to particular class members, and plainly predominate over individual questions.

Class action treatment is a superior method of adjudication. Rule 23(b)(3) procedural device was designed to conserve the resources of both the court and the parties. The central inquiry therefore, in determining whether to certify a class under Rule 23(b)(3) is whether economies of time, effort, and expense will be achieved, and whether uniformity of decisions will be attained. *See* Newberg on Class Actions § 17 at 17-48 (3d.ed. 1992). *See also Philadelphia Electric Co. v. Anaconda American Brass Co.*, 43 F.R.D. 452 (E.D. Pa. 1968) ("the proper function of the court is to apply the Rule in a manner best calculated to . . . advance, or at least not prejudice, recognized goals of public policy"). In certifying the class, the court may process the large number of claims with the least possible strain upon the total resources of the court system while advancing the public policies of labor, wages and benefits for the working class.

There is no other litigation now pending in Hawaii and no noticeable interest in separate actions so that (A) and (B) of Rule 23(b)(3) require no discussion. *Philadelphia Electric Co.*, 43 F.R.D. at 458.

Hawaii is of course the preferred forum in that the Plaintiffs all purchased their contracts in Hawaii, the class is limited persons who purchased in Hawaii

29

and thus have claims under HRS Chapter 480, and Midland's sales to Hawaii

residents were all conducted by Hawaii-based sales agents. Accordingly, under

subsection (C) of Rule 23(b)(3), this is not only the most desirable, but probably

the only, district for such litigation.

## B.   PLAINTIFFS' CLAIMS ARE MANAGEABLE AS A CLASS ACTION.

Rule 23(b)(3)(D) also suggests consideration of "the difficulties likely to be

encountered in the management of a class action." Manageability issues pose a

barrier to class certification only where they create a situation in which the class

action is less fair and efficient than other available adjudication techniques. *In re*

*Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 358 (E.D. Pa. 1976); *see also In re*

*Prudential*, 962 F. Supp. At 525 ("[M]ost courts hold manageability difficulties

cannot support denial of class certification when no other practical litigation

alternative exists."); 4 *Newberg*, § 4.32 at 269.

Courts disfavor denial of class certification on the grounds of "vaguely

perceived manageability obstacles" because such an action would be "counter to

the policy behind Rule 23, and because that court [would be] discounting unduly

its power and creativity in dealing with a class action flexibly as difficulties arise."

*In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 528 (S.D.N.Y.

1996). Additionally, when "each class members' claims center on common

questions and [when there is] overlap between the required questions of proof . . .

30

[the] economies of scale are magnified when weighed against the burden [the various] court systems would endure in trying numerous duplicative suits." *Hanrahan v. Britt*, 174 F.R.D. 356, 365-66 (E.D. Pa. 1997) (alterations added).

This is the quintessential case for class certification. Liability focuses on whether Midland engaged in a common course of conduct. That same company has detailed electronic databases of its dealings with class members. Plainly, a 624-member class with available electronic records is highly manageable.

Accordingly, maintenance of this suit as a class action represents the most efficient and economical procedure for adjudicating Plaintiffs' claims by providing Class Members with their "day in court" without overburdening the judicial system with a multiplicity of duplicative lawsuits. *Accord Joint Executive Bd. Of Culinary/Bartender Trust Fund v. Las Vegas Sands*, 244 F.3d 1152, 1163 (9th Cir. 201), cert. denied 534 U.S. 973, 122 S. Ct. 395, 151 L.Ed.2d 299 (2001) ("'If a comparative evaluation of other procedures reveals no other realistic possibilities, [the] superiority portion of Rule 23(b)(3) has been satisfied.'"); *Roper v. Consurve, Inc.*, 578 F.2d 1106, 1112 (5th Cir. 1978) ("The claims of a large number of individuals can be adjudicated at one time, with less expense than would be incurred in any other form of litigation.").

Class adjudication also benefits Midland. Midland will be relieved of having to potentially defend multiple lawsuits and its culpability, or lack thereof,

31

will be decided in one proceeding.  In addition, documents, fact witnesses and expert testimony need only be presented once.

Finally, no other practical litigation alternative exists.  "[W]here a court has already made a finding that common issues predominate over individualized losses, we would be hard pressed to conclude that a class action is less manageable than individual actions."  *Klay v. Humana Inc.*, 382 F.3d 1241, 1273 (11th Cir. 204), *cert. denied* 543 U.S. 1081, 125 S. Ct. 877, 160 L.Ed2d 825 (2005).  For all these reasons, a class action is unquestionably the superior method of adjudication.

With respect to subsection (D) of Rule 23(b)(3), manageability is a grounds for denying class certification only when such difficulties make a class action less fair and efficient than some other method.  Newberg on Class Actions § 4.32, at 4-125 (3d Ed. 1992).  *See also In re Workers' Comp.*, 130 F.R.D. 99, 110 (D. Minn. 1990) ("dismissal for management reasons is never favored").  Moreover, "the difficulties likely to be encountered in the management of a class action are not important when weighed against the benefits to the class, and any sub-class thereof, and to the administration of justice."  *Technograph Printed Circuits, Ltd. v. Methode Electronics, Inc.*, 285 F. Supp. 714, 724-25 (N.D. Ill. 1968).

"If there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should

later developments during the course of the trial so require." *Esplin v. Hirschi*,

402 F.2d 94, 99 (10th Cir. 1968), *cert. denied*, 394 U.S. 928, 89 S. Ct. 1194,

L.Ed.2d 459 (1969).

    **1.**    **Class Members Have Little Interest in Pursuing Individual
Actions Against Midland.**

Class litigation is appropriate where Class Members have little incentive to

litigate claims individually. Here, Plaintiffs and the elderly Class Members

specifically targeted and injured by Midland's unfair deceptive practices can ill-

afford the staggering costs of pursuing their claims individually against a

corporation the size of Midland. The opinion in *In re Heritage Bond Litig.*, 2004

U.S. Dist. LEXIS 15386 (C.D. Cal. 2004), is instructive. There, plaintiffs sought

certification of a class consisting primarily of elderly individuals who purchased

defendant's bonds. The plaintiffs presented evidence from a small number of

Class Members showing that potential losses ranged from $5,000-$50,000, but

argued that most Class Members' losses were small. *Id.* at *11. In holding that a

class action was the superior method for adjudicating the elderly purchasers'

claims, the Court reasoned:

> Thus, the class litigation of the claims of potentially
> hundreds, if not thousands, of Heritage bond purchasers
> not only gives plaintiffs with small claims a chance to
> obtain redress through aggregation against a well
> financed and organized defense but also promotes
> greater fiscal and logistical efficiency. Denying
> certification would be drastic because it would create the

> prospect of inefficient and costly multi-forum litigation
> that would not only be undesirable, but prejudicial to all
> parties–plaintiffs, defendants and witnesses–as well as
> the courts.

*Id.* The same reasoning is equally applicable here.

### 2.    The Lack of Pending Individual Suits Against Midland Demonstrates the Superiority of the Class Action Device.

Rule 23(b)(3)(B) suggests that the Court consider "the extent and nature of

any litigation concerning the controversy already commenced by or against

members of the class." Plaintiffs are unaware of any individual lawsuits presently

pending against Midland challenging the improper conduct at issue here. The lack

of individual actions supports Plaintiffs' position that individual Class Members

neither have the means nor possess a strong interest in individually prosecuting

their claims in separate litigation. *See In re Prudential Ins. Co. of Am. Sales*

*Practices Litig.*, 962 F. Supp. 450 (D. N.J. 1997) (explaining that the paucity of

individual actions in comparison to the large number of Class Members "suggests

little individual interest in prosecuting actions against Prudential").

## VI.    CLASS NOTICE IS WARRANTED UPON CERTIFICATION

In order to comply with HRCP Rule 23(c)(2), notice to the class of the

pendency of this action is required at this time. Fed. R. Civ. P. 23(c)(2)(B)

provides:

> For any class action maintained under Rule 23(b)(3), the Court
> must direct to class members the best notice practicable under

34

the circumstances, including individual reasonable effort. The notice must concisely and clearly state in plan, easily understood language:

8.      the nature of the action,

9.      the definition of the class certified,

10.     the class claims, issues, or defenses,

11.     that a class member may enter an appearance through counsel

        if the member so desires,

12.     that the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded, and

13.     the binding effect of a class judgment on class members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).

Notice is required upon certification of the class as the court has an obligation to "protect the interests of absent class members at all stages of litigation." *Montalvo v. Chang,* 64 Haw. 345, 358, 641 P.2d 1321, 1331 (1982), *overruled on other grounds, Chun v. Board of Trustees of Employees' Retirement System,* 92 Haw. 432, 992 P.2d 127 (Hawaii 2000). Notice serves to protect the interests of members that may wish to opt out and bind those that do not. *In re Gypsum Antitrust Cases,*, 565 F.2d 1123, 1125 (9th Cir. 1977). Without prompt notice, class members will not have adequate time to exercise the various options to opt out or to have separate counsel as allowed by Fed. R. Civ. P. 23.

35

With regard to the timing of class notice, Newberg on Class Actions

provides:

> There is no occasion for any notice until the propriety of the
> class action has been determined, at least tentatively.  But if it
> seems obvious that if notice is to be effective – if class
> members are to have a meaningful opportunity to request
> exclusion, appear in the action, object to the representation, etc.
> - **the invitation must go out as promptly as the
> circumstances will permit.  The Manual for Complex
> Litigation advises that notice generally be given promptly
> after class certification.**

Newberg on Class Actions, § 8:9 at 192 (4th ed. 2002) (emphasis added).

In this case, Fed. R. Civ. P. 23(c)(2) requires the, "best notice practicable

under the circumstances."  Courts have universally held that "best notice

practicable" under Fed. R. Civ. P. 23(c)(2) is satisfied by mailed notice to class

members.  *In re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d 1088 (5th Cir.

1977) (where individual notice could be given to class members complied from

Defendants retail delivery report cards, mailout was best);  *Malby v. General

Electrical Credit Corp.*, 61 F.R.D. 59 (N.D. Ohio 1973) (individual notice was

most appropriate because individual members could be determined);  *Ouellette v.

International Paper Co.,*  86 F.R.D. 476 (D. Vt. 1980) (when class members'

identity could be found from town records, individual mailout notice was most

appropriate); *In re Gympsum Antitrust Cases*, 565 F.2d 1123 (9th Cir. 1977)

(notice provisions require individual notice by mailout).

36

Plaintiffs have prepared the proposed notice for mailing to the Class members that can be identified by Midland's business records. Plaintiffs respectfully urge the Court to approve the contents of the proposed notice but seek leave of the Court to allow formatting to be made in accordance with the requirements set forth by the company handling the actual dissemination and mailing of the notice.

Plaintiffs suggest that the mailed notices be disseminated 30 days after approval of the notices. Newberg on Class Actions indicates that the "bulk of notices directing 30-to-60 day intervals between mailing or publishing class notice and the filing of an affirmative response by class members." Newberg on Class Actions, § 8:37 at 276 (3d ed. 1992). Consequently, Plaintiffs would suggest a deadline to opt out of 60 days after the notices are sent.

This Court has jurisdiction over the claims at issue and the parties involved in this action. The forms of the notices attached contain all of the essential elements necessary to satisfy the requirement of Federal law -- the Federal Rules of Civil Procedure and federal due process provisions -- including the class definition, the identities of the parties and their counsel, and information regarding the manner in which requests for exclusions or to opt out may be submitted and a deadline for doing so. The foregoing notice constitutes the best practical notice under the circumstances of this case.

37

## VI.    <u>CONCLUSION.</u>

Based on the foregoing, Plaintiffs respectfully request that the Court grant this Motion and certify a Rule 23(b)(3) Class for purposes of pursuing statutory claims against Midland.

DATED:  Honolulu, Hawaii, November 9, 2006.

BICKERTON SAUNDERS DANG & SULLIVAN

/S/ JAMES J. BICKERTON

JAMES J. BICKERTON

Attorneys for Plaintiffs