ROBERT D. PHILLIPS, JR. (*Pro Hac Vice*)
(rphillips@reedsmith.com)
MARSHALL C. WALLACE (*Pro Hac Vice*)
(mwallace@reedsmith.com)
LINDA B. OLIVER (*Pro Hac Vice*)
(loliver@reedsmith.com)
REED SMITH LLP
1999 Harrison Street, Suite 2400
Oakland, CA  94612-3572

**Mailing Address:**
P.O. Box 2084
Oakland, CA  94604-2084

Telephone:  510.763.2000
Facsimile:   510.273.8832

STEVEN B. JACOBSON 4117-0
(sjacobson.law@hawaiiantel.net)
Steven B. Jacobson
Attorney at Law
A Limited Liability Law Company
P. O. Box 240761
Honolulu, HI 96824-0761

Telephone:  808.377.1814
Facsimile:   808.377.1814

Attorneys for Defendant
Midland National Life Insurance Company

## UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAI'I

| | |
|---|---|
| GARY YOKOYAMA, attorney-in-fact for Leatrice C. Yokoyama, CATHERINE E. THORSON; and EDNA C. YAMANE, by her attorney-in-fact Kathleen Maeda, individually and on behalf of a Class of Similarly Situated Persons,<br><br>             Plaintiffs,<br><br>   vs.<br><br>MIDLAND NATIONAL LIFE INSURANCE COMPANY,<br><br>            Defendant. | Civil No. CV 05-00303 JMS KSC<br><br>**MIDLAND NATIONAL LIFE INSURANCE COMPANY'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR CLASS CERTIFICATION**<br><br>Date:       December 15, 2006<br>Time:      9:30 a.m.<br><br>Honorable Kevin S.C. Chang |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF OPPOSITION ............................ 1

II.   BACKGROUND ............................................................................. 3

    A.    Midland's Fixed Index Annuity Contracts ........................................... 3

    B.    Midland FIAs Are Sold In Personalized Transactions
        Between Independent Brokers And Individual Purchasers.................. 5

    C.    FIA Owners Receive And Acknowledge Key Disclosures.................. 8

    D.    FIA Transactions Can Have Many Different Outcomes...................... 9

    E.    The Great Majority Of Class Members Are Happy With
        Their Solid Gains And Other Features Of Their Midland
        FIAs .................................................................................................. 10

III.  PROCEDURAL HISTORY .................................................................. 11

IV.   LEGAL ANALYSIS............................................................................. 13

    A.    Plaintiffs Have The Burden On This Class Certification
        Motion, And That Burden Is Particularly Great Because
        The Class Members' Suitability Claims Are To Be
        Determined Individually.................................................................... 13

    B.    Individual Issues Predominate In All Of Plaintiffs' Claims .............. 14

        1.    Case Law Consistently Holds That Individual Issue
            Predominate In Insurance Sales Cases..................................... 14

        2.    Proof Of Plaintiffs' Unfair Practices Claims Will
            Require Resolution Of Numerous And Predominating
            Individual Issues...................................................................... 16

        3.    Dr. McCann's Flawed Opinions Do Not Eliminate
            The Individual Issues From Class Members' Claims.............. 21

        4.    Plaintiffs' Own Claims Show Individual Issues
            Predominate............................................................................. 24

C.    Plaintiffs Do Not, And Cannot, Satisfy Rule 23(b)(3)'s Superiority Requirement Because Individual Resolution Of Their Claims Is Far Superior To Addressing These Disparate Transactions On A Class Basis .......................................... 26

V.    CONCLUSION ............................................................................................ 29

# TABLE OF AUTHORITIES

## CASES

**Page**

Besinga v. U.S.,
   923 F.2d 133 (9th Cir. 1991) ...............................................................13

Castano v. American Tobacco Co.,
   84 F.3d 734 (5th Cir. 1996) .......................................................... 26-27

Chin v. Chrysler Corp.,
   182 F.R.D. 448 (D. N.J. 1998).............................................................27

Cohn v. Mass. Mutual Life. Ins. Co.,
   189 F.R.D. 209 (D. Conn. 1999) ....................................................15, 16

Daly v. Harris,
   209 F.R.D. 180 (D. Haw. 2002)............................................................13

Gen. Tel. Co. of the Southwest v. Falcon,
   457 U.S. 147 (1982)...........................................................................13

Hum v. Dericks,
   162 F.R.D. 628 (D. Haw. 1995).............................................................17

Hurd v. Monsanto Co.,
   164 F.R.D. 234 (S.D. Ind. 1995)...........................................................29

In re LifeUSA Holding, Inc.,
   242 F.3d 136 (3d Cir. 2001)..........................................................2, 14, 15

In re Northern Dist. Cal. Dalkon Shield IUD Prod. Liab. Litigation,
   693 F.2d 847 (9th Cir. 1982) ................................................................28

Jenkins v. Commonwealth Land Title Ins. Co.,
   95 F.3d 791 (9th Cir. 1996) .................................................................16

Keyes v. Guardian Life Ins. Co. of America,
194 F.R.D. 253 (S.D. Miss. 2000) ...................................................................15

Parkhill v. Minn. Mutual Life Ins. Co.,
188 F.R.D. 332 (D. Minn. 1999)................................................................2, 15

Sambor v. Omnia Credit Services, Inc.,
183 F. Supp. 2d 1234 (D. Haw. 2002).........................................................16

Szabo v. Bridgeport Machines, Inc.,
249 F.3d 672 (7th Cir. 2001) .......................................................................13

Thorn v. Jefferson-Pilot Life Ins. Co.,
2006 WL 561505 (4th Cir. 2006) .................................................................29

Valentino v. Carter-Wallace, Inc.,
97 F.3d 1227 (9th Cir. 1996) ........................................................................29

Van West v. Midland Nat'l Life Ins. Co.,
199 F.R.D. 448 (D. R.I. 2001) ................................................................15, 27

## STATUTES

Fed. R. Civ. P. 23 ....................................................................................passim

Fed. R. Civ. P. 23(a) ...............................................................................13, 29

Fed. R. Civ. P. 23(b) .....................................................................................13

Fed. R. Civ. P. 23(b)(1)...........................................................................13, 14

Fed. R. Civ. P. 23(b)(2)...........................................................................13, 14

Fed. R. Civ. P. 23(b)(3).......................................................................2, 13, 26

Fed. R. Civ. P. 23(b)(3)(D)............................................................................26

Haw. Rev. Stats. § 431:10D.....................................................................17, 18

Haw. Rev. Stats. § 431:2-203.........................................................................29

Haw. Rev. Stats. § 480-2........................................................................... 12, 16, 17, 21

Haw. Rev. Stats. § 480-13..................................................................................3, 12

Haw. Rev. Stats. § 480-13(b) ..................................................................................16

## I. INTRODUCTION AND SUMMARY OF OPPOSITION

This spring, the Court determined that this case – alleging that independent life insurance agents sold Hawai'i seniors unsuitable Midland National Life Insurance Company ("Midland") annuities – should not proceed as a class action. In response, Plaintiffs' lawyers scrambled to come up with an alternative theory to take another shot at class certification. The present motion is the best they could do, and it still falls far short of the mark. Plaintiffs have attempted to recast their "suitability" case as a case that Midland "deceived" each and every senior annuity purchaser in Hawai'i over a four-year period, but at its core this remains a suitability case, and it remains subject to the <u>same</u> individualized factors that led the Court to deny class certification the first time.

Plaintiffs fail to meet FRCP 23's requirements for certification for at least two fundamental reasons. ***First***, Plaintiffs fail to show that common issues <u>predominate</u> over individual issues. Plaintiffs' newly-added theory is that Midland's Fixed Index Annuities ("FIAs") are "inherently unfair or deceptive." But even if Plaintiffs' theory has any arguable merit – and it does not – it will still require resolution of individual issues at numerous levels. As Judge Seabright recognized when he denied Plaintiffs' earlier certification motion, the key fact is that <u>every</u> Midland FIA transaction was and is the product of oral conversations and other interactions between (1) an individual having his or her own unique personal and financial attributes and objectives and (2) his or her independent insurance broker. As a result, each FIA transaction necessarily is unique. Simply put, because each sales presentation and each transaction can differ greatly from

the next, the Court cannot fairly adjudicate Plaintiffs' case on a class-wide basis without ignoring the personal and financial circumstances of each class member, his or her communications with his or her broker, and the other individualized details of each annuity transaction. Virtually every comparable case regarding insurance sales reject class certification based on such claims. *See, e.g., In re LifeUSA Holding, Inc.*, 242 F.3d 136 (3d Cir. 2001); *Parkhill v. Minn. Mutual Life Ins. Co.*, 188 F.R.D. 332, 343 (D. Minn. 1999).

Plaintiffs try to avoid these facts and this law through the declaration of a litigation consultant, Craig McCann. But Dr. McCann's one-size-fits-all opinions do not even address the predominant individual issues: he simply ignores key preferences of annuity buyers, key features of Midland FIAs, and the key role of the broker. Moreover, his analysis is fundamentally wrong, due to his use of badly flawed assumptions about Midland's FIAs. In fact Hawai'i seniors, who have ***not*** incurred surrender or withdrawal charges in most cases have <u>earned tax-deferred interest at rates from 3 percent to 9 percent per year</u> on their Midland FIAs, with no downside. Only a biased economist or a hyperbolic plaintiff's lawyer would call such contracts "inherently deceptive".

***Second***, Plaintiffs do not show classwide adjudication to be <u>superior</u> to individual resolution under these circumstances, as Rule 23(b)(3) requires. Because inherently individual issues pervade each FIA purchase, any classwide trial would degenerate into a fragmented morass. The moving party always has the burden on a class certification motion, but here, Plaintiffs' burden is especially great, for this Court has already determined that suitability claims must be resolved

on an individual basis. Given that established fact, it could not be "superior" to artificially require individual suitability determinations for each class member while somehow deciding "inherent deception" on a common basis. Moreover, those seniors who did receive faulty advice from their brokers may have substantial claims against their brokers, which would have to either be abandoned or folded into Plaintiffs' proposed class action – hardly a "superior" approach. Finally, this is far from the prototype class action where claims are so small that the individual has no economic incentive to pursue his or her case: the average senior's FIA purchase exceeded $50,000, and HRS § 480-13 allows recovery of attorneys' fees and treble damages. Individual resolution is far superior.

Judge Seabright got it right. Certifying this case as a class action would, as a practical matter, result in massive administrative headaches as the parties and the Court grapple with the nightmare of combined class and individual resolution of issues. Worse, certification would cause manifest injustice, both to Midland – who would have the cases of three ostensibly dissatisfied owners disrupt hundreds of other contracts, including those of all senior FIA owners who are happy with their contracts – and to those few absent class members who may actually have been sold an unsuitable annuity by a rogue broker. For all of the reasons stated below, Plaintiffs' attempt to certify a class should again be rejected.

## II    BACKGROUND

### A.    Midland's Fixed Index Annuity Contracts

Midland FIAs are insurance contracts. They are regulated by state insurance departments, including the Insurance Division of the Hawai'i Department of

Commerce and Consumer Affairs. They are not "investments" or securities, nor are they regulated by the SEC. Declaration of Robert TeKolste ("TeKolste Dec."), ¶2.

Though FIAs may vary greatly in their terms, they generally offer two key benefits: protection of principal, and the prospect of greater credited interest than other contracts such as CDs or traditional fixed annuities. They achieve these benefits by allowing the owner to allocate his premium between (1) a "fixed account" on which Midland credits interest at a rate at or above a guaranteed minimum rate annually, and (2) an "index account" in which Midland credits interest linked to any annual gain experienced by a specified stock market index, such as the S&P 500 index, or the Dow Jones Industrial Average. Contrary to Plaintiffs' assertion, and consistent with Midland's documents, Midland credits interest according on 100% of the premium allocated to each account. *See, e.g.,* TeKolste Dec., Exs. E-I; Declaration of Don Lyons ("Lyons Dec."), ¶11. Even in a year where the stock market index declines, the premium plus accrued interest – the "accumulation value" of the annuity – does not decline. And, if part or all of the premium is allocated to the fixed account, the accumulation value will increase regardless of the rise or the fall of the stock market indices. TeKolste Dec., ¶8.

Midland FIAs thus are attractive to many financially conservative individuals because they are long-term contracts offering the owner a "ratchet" – guaranteed interest with the prospect of increased interest when equity markets go up, but no loss of principal when markets go down. *Id.*, ¶8; Exs. E – I. Midland can offer such guarantees and returns by investing in a portfolio consisting chiefly

of longer-term investments. *Id.*, ¶9; Lyons Dec., ¶ 9. Midland FIAs therefore

impose "surrender charges" – penalties for early withdrawal by the owner in

contravention of the long-term nature of the FIA – which are repeatedly,

conspicuously and accurately disclosed in Midland's documents. *See* Lyons Dec.,

¶8(a); TeKolste Dec., Exs. E - I, R-W, Y.

## B.   Midland FIAs Are Sold In Personalized Transactions Between Independent Brokers And Individual Purchasers

As Judge Seabright has already determined, each Midland FIA transaction

involves a combination of inherently unique factors and circumstances, beginning

with each annuity owner's financial portfolio, risk appetite, anticipated financial

needs, education level, sophistication, and subjective financial desires. Order

Denying Without Prejudice Plaintiffs' Motion for Class Certification ("Order"), p.

4; TeKolste Dec., ¶ 37; Declaration of Edwin Buck ("Buck Dec."), ¶ 7.

The named Plaintiffs here demonstrate these differences: Ms. Yamane and

her now-deceased husband pursued education only through middle school, but she

owns income property. Declaration of Linda B. Oliver ("Oliver Dec."), Ex. A at

7:12-8:15, 14:15-17, 16:9-13. Ms. Thorson, by contrast, has Bachelor's and

Master's degrees. She is sophisticated about and actively manages her finances,

and she already owned multiple other annuities when she decided to purchase her

Midland annuity. *Id.*, Ex. K at 9:6-14, 11:16-12:4, 16:1-12, 24:22-25:21, 41:14-

42:16, 50:3-12, 73:13-75:14; Ex. L. Ms. Yokoyama left school after the eighth

grade and left all financial affairs to her now-deceased husband Norman

Yokoyama, who had a degree from Honolulu Business College, actively handled

their finances and sought out FIAs because he did not like how some of his

investments had been performing. *Id.,* Ex. V at 8:16-18, 10:4-9, 17:20-18:6, 19:23-20:9; Declaration of Mark Teruya ("Teruya Dec."), ¶6.

The next party to each FIA transaction is the independent insurance broker – whose indispensable role Plaintiffs and Dr. McCann simply ignore. Midland does not offer its annuities directly to the public, nor does it have its own "captive" agents who offer only Midland products. TeKolste Dec., ¶¶19-20. Rather, its FIAs are offered by independent insurance brokers, who typically offer multiple different insurance products from different companies. *Id.*, ¶¶19-23.

Insurance brokers are in many ways the prototypical American small business. They come from all backgrounds, may work individually or in agencies, and many brokers hold other professional licenses, such as a securities license. Some are CPAs or real estate agents. *Id..*, ¶24; Buck Dec., ¶6. As a result of these many factors, brokers will employ their own business philosophies, client development and sales approaches, marketing techniques, and written and oral communications. TeKolste Dec., ¶22; Buck Dec., ¶22.

Unlike an insurance company that employs captive agents, Midland does not train brokers "how to sell." TeKolste Dec., ¶29. Brokers typically obtain their core sales training and education through working with an agency, the state licensing process, private educational companies, and experience in other professions. *Id.*, ¶30. While Midland asks brokers to give accurate descriptions of product features by using product brochures and disclosures at the point of sale, it does not train, let alone encourage, brokers to use a "script" or a standard "sales pitch," or anything of the sort. *Id.*, ¶27. If a broker does not meet Midland's

standards, Midland will terminate that appointment, as it did in 2003 with Plaintiffs' brokers, Rhonda Teruya and Mark Teruya, after several of their customers complained. *Id.*, ¶34.

Most brokers begin the relationship with their clients by learning as much as they can about the assets, liabilities, risk preferences, goals and other characteristics of the client. *Id..*, ¶¶ 39-42; Buck Dec., ¶¶ 8-21. That information dictates the broker's further communications with the client. Midland does not require brokers to employ any particular language or discuss any particular annuity feature with their clients. TeKolste Dec., ¶27. Instead, Midland requires that brokers (1) provide certain mandatory documentation; (2) obtain the customer's signature on the relevant disclosures and forms; and (3) certify they have said nothing inconsistent with Midland's brochures and disclosure forms. Midland's documents inform the brokers what they may not do, rather than what they must do, in communicating with their clients. *Id..*, ¶¶28, 44, 46, 49-50.

As a result, brokers' presentations and communications with their clients are primarily oral, and they will vary a great deal from client to client and from broker to broker. *Id.*, ¶41; Buck Dec., ¶¶ 8, 17; Teruya Dec., ¶¶7, 11, 14. Brokers will simplify concepts, use their own language, and otherwise tailor their presentations to ensure their clients understand the features and restrictions of the FIAs. Buck Dec., ¶8; TeKolste Dec., ¶39-42, 46. Plaintiffs' speculation that brokers regurgitate the language of Midland's forms is entirely at odds with the personalized communications employed by the vast majority of brokers. TeKolste

Dec., ¶¶ 39-42; Buck Dec., ¶¶ 8-21.  Moreover, Plaintiffs offer no evidence to support their speculation.

If the broker and client agree that an FIA is appropriate, they then must decide which company's annuities to consider and if Midland, which Midland annuity is most appropriate.  Midland has offered at least 25 different deferred annuities in Hawai'i and their terms vary a great deal.  TeKolste Dec., Exs. C-K; Lyons Dec., Ex. B.

**C.     FIA Owners Receive And Acknowledge Key Disclosures**

Once the broker and client have chosen a Midland FIA, the client must complete an application and disclosure form.  TeKolste Dec., ¶44; Exs. T-W.  Since 2003, Midland's forms have required the applicant to provide suitability information and to initial the following language:

> I understand that the [name of annuity] is a ***long-term contract with substantial penalties*** for early surrenders. A surrender charge is assessed (as listed below) on any amount withdrawn, whether as a partial withdrawal or full surrender, that is in excess of the penalty-free amount applicable. The surrender charges are for [number] years and decline as follows:  [table of surrender charge percent by year]:
>
> **These liquidity provisions are suitable for my financial needs, such as cash for living and other related expenses.  This contract is suitable for my financial needs.**  (*Id.*, ¶ 49)

From the time annuities are initially discussed with a potential policyholder, Midland's documents prominently disclose and discuss surrender charges and liquidity issues *at least four times* in every transaction.  *Id.*, Exs. E-I, T-W, AA.  In addition to these written disclosures, brokers commonly orally describe the FIAs' surrender charges and liquidity provisions in simple, concrete terms.  *Id.*, ¶46; Buck Dec., ¶ 25; Teruya Dec., ¶¶7, 11, 14.

Through this combination of written disclosures and broker conversations, prospective annuity owners can, and usually do, learn the matters that Plaintiffs allege are not disclosed to them:

- Most individuals understand the unsurprising fact that their insurance broker is not working for free, but is compensated by a commission paid by the insurer. Buck Dec., ¶27. Brokers also may tell their clients about their commission. *Id.*; TeKolste Dec., ¶43.

- Midland documents expressly disclose that its Index Margin "is guaranteed for the first year and is set in advance each year thereafter" and the fixed account interest rate "offers a declared rate for the first year and then provides a renewal rate thereafter." TeKolste Dec., Ex. T. Brokers commonly discuss with their clients the fact that Midland will re-set these rates after the contract anniversary. Buck Dec., ¶29; Teruya Dec., ¶¶8, 12, 15.

- Midland expressly and precisely discloses its "interest adjustment" applied to early surrenders and withdrawals in excess of the penalty-free amount. TeKolste Dec., Ex. S. Brokers, on the other hand, typically do not discuss this feature because it applies only when the FIA is surrendered, and their clients generally do not contemplate surrendering the annuity at the time of purchase. Buck Dec., ¶30; Teruya Dec., ¶9.

## D.   FIA Transactions Can Have Many Different Outcomes

Once the policy is issued, the transaction may follow any number of different paths, each of which will have a major impact on the rights of the owner

and Midland. Midland gives all Hawai'i owners at least 20 days following receipt of the contract, during which time the owner may rescind the contract and get a refund of his premium (the "free-look" period). Some Hawai'i owners have exercised this right. Gioffredi Dec., ¶5.

Midland FIAs offer several valuable features, which can greatly affect the outcome of any particular transaction. After the first anniversary, the owner can withdraw up to 10% of the accumulation value without penalty. *Id.*, ¶¶ 6, 10. If she requires nursing home confinement or contracts a terminal illness, and the annuity has an appropriate rider, the penalty-free withdrawal amounts increase considerably. *Id.*, ¶17; Exs. B, D. The owner can also elect, after the first anniversary, to annuitize – that is, to convert his accumulation value to a stream of payments commencing immediately without surrender charges. *Id.*, ¶13.

Additionally, and importantly, all Midland's FIAs provide for specification of a beneficiary, and payment of the <u>full accumulation value</u> to the beneficiary upon the annuitant's death – <u>without a surrender charge</u>. *Id.*, ¶¶ 14-15.

**E.   The Great Majority Of Class Members Are Happy With Their Solid Gains And Other Features Of Their Midland FIAs**

Depending on the FIA chosen by the owner, the timing of the transaction, and the performance of the financial markets, owners can experience great variety in the growth of their accumulation values. Contrary to the worst-case-scenario insinuations of Dr. McCann, in fact a sample of Hawai'i FIA owners who have not incurred surrender or withdrawal penalties shows they have already earned <u>healthy returns ranging, on average, from 3% to 9% per year</u>. *See* Lyons Dec., Ex. A. These accumulation value gains are tax-deferred, and they will not decrease.

Not surprisingly, given these returns and other features of Midland FIAs, most of Midland FIA owners – including seniors – are happy with their annuities. *See* Gioffredi Dec., ¶21; Buck Dec., ¶14. During the four years preceding the Complaint, Midland received only 18 complaints (including Plaintiffs' claims here) from Hawai'i seniors about FIAs. Gioffredi Dec., ¶21; Ex. E.

### III. PROCEDURAL HISTORY

Plaintiffs (or, in the cases of Ms. Yokoyama and Ms. Yamane, their children) filed this lawsuit in mid-2005 asserting one issue: whether FIAs were suitable for seniors given their surrender periods and charges. Second Amended Complaint ("SAC"), ¶¶ 2-3, 7, 47, 54, and Prayer, ¶ 1; Order, p. 4.

Earlier this year, Plaintiffs moved for class certification. After full briefing and argument, Judge Seabright denied Plaintiffs' the motion. He agreed with Midland that "individual rather than common issues predominate," concluding as follows:

> While age may be a factor in the suitability analysis, there are a number of other individualized factors that would require consideration. A fact finder would need to consider evidence regarding the financial needs of each plaintiff as well as his or her understanding of the deferred annuity product and level of financial sophistication. Additionally, evidence regarding the sales practices of numerous independent brokers may be relevant. [¶] Such individualized inquiries for a large class of plaintiffs would be unmanageable in a single case. Because individual issues clearly predominate in the Plaintiffs' suitability-based claims, certification of the proposed class is inappropriate. [Order, at 4]

Judge Seabright denied the motion, permitting Plaintiffs to file a Third Amended Complaint and seek certification based on that new complaint. *Id.*, at 5-6.

Plaintiffs have now filed their Fourth Amended Complaint ("FAC"), which contains three Claims for Relief, each alleging violations of HRS §§ 480-2 and 480-13. Plaintiffs' First Claim alleges Midland sold seniors FIAs "which were unsuitable for their insurance and financial needs;" their Second Claim contends the FIAs are "inherently unfair or deceptive" because they contain "hidden charges, changing terms, and undisclosed expenses and risks;" and their Third Claim asserts Midland "deceptively or unfairly marketed" its FIAs because it failed to provide information about the "actual costs" and "inherent risks and minimal benefits," and failed to "independently verify the suitability" of its FIAs. FAC, ¶¶ 57-62. Plaintiffs' governing complaint thus still directly attacks the individual suitability of each putative class member's FIAs. And Plaintiffs' central claim remains unchanged: Plaintiffs still demand damages resulting from Midland "selling deferred annuities not suitable for their age or situation without making full and proper disclosures." *Id.*, at Prayer, ¶ 1.

Plaintiffs have now renewed their certification motion. Tellingly, the motion does not even <u>mention</u> Judge Seabright's determination that suitability issues must be individually resolved. Plaintiffs scarcely mention their own transactions, in which they have incurred no charges, and have earned interest on 100 percent of their premiums. And perhaps most important, Plaintiffs assiduously avoid discussion of <u>the role that each putative class member's independent insurance brokers plays in every transaction</u>. Plaintiffs ask the Court to ignore these dispositive factors and instead adopt opinions of an unqualified litigation consultant. The Court should have no difficulty denying Plaintiffs' motion, again.

## IV.   LEGAL ANALYSIS

**A.   Plaintiffs Have The Burden On This Class Certification Motion, And That Burden Is Particularly Great Because The Class Members' Suitability Claims Are To Be Determined Individually**

Plaintiffs bear the burden of proof on each of FRCP 23's requirements for certification, and a district court must engage in "a rigorous analysis" to determine whether the rule's prerequisites have been satisfied. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982). The analysis requires that the court look beyond the complaint's allegations to understand the facts. *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675-76 (7th Cir. 2001) (Rule 12(b)(6) approach not appropriate on class certification motion; court must examine facts).

Under Rule 23, Plaintiffs first must prove numerosity, commonality, typicality and adequacy as set out in Rule 23(a), then they must satisfy the requirements of one of the subsections of Rule 23(b). Just as before, Plaintiffs' case asserts a claim for damages, so Plaintiffs must proceed under Rule 23(b)(3), and prove both that "questions of law or fact <u>predominate</u> over any questions affecting only individual members" <u>and</u> that "a class action is <u>superior</u> to other available methods for the fair and efficient adjudication of the controversy."[1] Fed. R. Civ. P. 23(b)(3) (emphasis added).

---

[1] The Court readily rejected the Plaintiffs' assertions that a class could be certified under Rule 23(b)(1) or 23(b)(2), reasoning that "[t]hough the Plaintiffs seek declaratory and injunctive relief, their primary claim is for damages," so certification under Rule 23(b)(2) is inappropriate. Order, at 3, n. 2, *citing Besinga v. U.S.*, 923 F.2d 133, 135 (9th Cir. 1991) and *Daly v. Harris*, 209 F.R.D. 180 (D. Haw. 2002). Neither Plaintiffs' latest Complaint nor their motion provides any fact to alter this decision. The motion contains only one conclusory paragraph on Rules 23(b)(1) and 23(b)(2), and damages remain Plaintiffs' principal remedy. Plaintiffs' renewed, yet still perfunctory, requests for certification under these

Plaintiffs' burden here is much greater than in the usual case, for Judge Seabright has already ruled that suitability issues must be determined individually. As a result, Plaintiffs must prove that common issues predominate and that a class action is superior to individual actions, even though it is a <u>given</u> that the central suitability issues will have to be individually litigated.

Plaintiffs have responded not by alleging anything truly new, but instead by recasting their suitability allegations as misrepresentation claims. Last time, Plaintiffs alleged the surrender charges made the FIAs a poor investment for seniors. SAC, ¶¶ 2, 7. Now, say Plaintiffs, the "gravamen" of their case is that Midland does not disclose the fact that the broker is earning a commission or Midland profits, and that Midland "conceals the fact that part of the consumer's money is gone" by including long-term surrender charges in its contracts. Pls. Mem., at 11-12. Because the issue is essentially the same, the outcome should be the same.

**B.    Individual Issues Predominate In All Of Plaintiffs' Claims**

> **1.    Case Law Consistently Holds That Individual Issue Predominate In Insurance Sales Cases**

As Judge Seabright recognized, federal courts have repeatedly denied class certification in cases involving the sale of insurance policies or annuities because individual issues predominate. Order, at 4. *In re LifeUSA Holding, Inc.*, 242 F.3d 136 (3d Cir. 2001) is dispositive. There, the plaintiffs sued an annuity company for alleged pre-sale misrepresentations by independent agents. The Court of

---

grounds should be rejected.

Appeals concluded that the plaintiffs had failed to establish commonality, much less predominance, citing the following factors:  non-uniform agent presentations to plaintiffs; independent agents who did not work exclusively with LifeUSA; agents' use of their own marketing materials; agents' voluntary attendance of LifeUSA's seminars; agents' non-uniform use of LifeUSA's marketing materials; and plaintiffs' failure to read or recall the substance of LifeUSA's marketing materials.  *Id.* at 145-47.  Based on these factors, the court held that the district court had abused its discretion in certifying a class and reversed the order.  *Id.* at 148.  <u>All</u> of these factors are present here.

*LifeUSA* is only one case among many denying class certification in insurance sales situations.  *See, e.g., Van West v. Midland Nat'l Life Ins. Co.*, 199 F.R.D. 448 (D. R.I. 2001) (predominant individual issues included: what oral representations brokers made, whether and to what extent each class member justifiably relied on the alleged misrepresentations, and what damages each class member suffered); *Keyes v. Guardian Life Ins. Co. of America*, 194 F.R.D. 253, 257 (S.D. Miss. 2000); *Cohn v. Mass. Mutual Life. Ins. Co.*, 189 F.R.D. 209, 213 (D. Conn. 1999); *Parkhill v. Minn. Mutual Life Ins. Co.*, 188 F.R.D. 332, 343 (D. Minn. 1999) ("if certification were granted, the court would have to conduct thousands of individual inquiries into the content of each sales presentation, the expectations and questions asked by each policyholder, and the reliance placed by the policyholder on the representations made by defendant's agents").

All these cases invoke the same principle:

[The] common questions are overshadowed by individualized issues

such as the nature of the oral representations or disclosures made by the agent or broker at the point of sale, the nature of any questions asked by the consumer, the content of any written…disclosures given to the consumer, the degree of care exercised by the consumer in reviewing [written material], the portions of the offer that were attractive to the consumer, the degree of the consumer's financial sophistication and his or her understanding of the product. These individualized issues, which are essential to the determination of the claims of each class member, predominate over questions common to the class. [*Cohn, supra*, 194 F.R.D. at 261]

This statement applies here. The unique circumstances woven through each putative class member's claim predominate over any possible common issues.

## 2.   Proof Of Plaintiffs' Unfair Practices Claims Will Require Resolution Of Numerous And Predominating Individual Issues

Plaintiffs in this action seek damages based upon HRS Section 480-2, which prohibits "unfair or deceptive acts or practices," and 480-13(b), which authorizes actions only "by persons injured" by violations of Section 480-2.  In order to prevail under these statutes, a plaintiff must establish the following elements:  (1) An "unfair" or "deceptive" act or practice in violation of Section 480-2; (2) injury to the plaintiff caused by the "unfair" or "deceptive" act or practice; and (3) proof of the amount of damages.  *See* HRS §§ 480-2 and 480-13 (b)(1); *Jenkins v. Commonwealth Land Title Ins. Co.*, 95 F.3d 791, 799 (9th Cir. 1996).  Thus, a plaintiff must prove that she sustained actual damages caused by the alleged "unfair" or "deceptive" act or practice.  "[T]he mere existence of a violation is not sufficient *ipso facto* to support the action; forbidden acts cannot be relevant unless they cause private damage."  *Jenkins, supra,* 95 F.3d at 799; *accord, Sambor v. Omnia Credit Services, Inc.*, 183 F. Supp. 2d 1234, 1244-45 (D. Haw. 2002)

-16-

(summary judgment for plaintiff denied where plaintiff could not establish "actual damages" caused by the alleged Section 480-2 violation).[2]

As Judge Seabright decided in July, these elements require individualized inquiries on multiple levels. *See Hum v. Dericks*, 162 F.R.D. 628, 640 (D. Haw. 1995) (denying certification of HRS § 480-2 claim; although the defendant testified that he had told each plaintiff similar things, the possible variations in the conversations and among plaintiffs' circumstances rendered plaintiff's Chapter 480 case unsuitable for certification). The Court's Order establishes that individual issues predominate on seniors' suitability claims. The same is true for each of Plaintiffs' supposed nondisclosures.

<u>Alleged Non-Disclosure Of Commissions And Profits</u>: Plaintiffs first repackage their suitability case by asserting that Midland did not disclose that the broker would earn a commission, and that Midland imposes surrender charges to "conceal" that this money is "gone." Pls. Mem., pp. 10-12. The evidence, however, demonstrates that: (1) many seniors already know that the insurance broker is not helping them for free, but receives a commission paid by the insurance company; and (2) some brokers at least some of the time disclose not

---

[2] The Hawai'i Legislature has already rejected Plaintiffs' arguments. Rather than banning the sale of FIAs to seniors, the Legislature has determined that effective January 1, 2007, an annuity seller must disclose to a prospective purchaser the NAIC's "Buyer's Guide To Fixed Deferred Annuities" and a "disclosure document" setting forth key aspects and restrictions of the annuity. Declaration of William H. Higgins, ("Higgins Dec."), Ex. B at HRS 431:10D-C. Notably, the new statute does not require disclosure of the broker's commission or the profits of the insurer, and it specifically contemplates that deferred annuities will be sold in Hawai'i. This Act shows that Plaintiffs ask the Court to do that which the Hawai'i Legislature declined to do.

only that they will receive a commission, but also the amount of that commission. Buck Dec., ¶27; TeKolste Dec., ¶43. Whether or not a particular senior knew the broker was receiving a commission, and how much, or if not, whether that information would have made a difference, is thus a senior-by-senior issue, which cannot be assumed on a classwide basis. Notably, Plaintiffs themselves do not allege that they (or their husbands) did not know their broker was earning a commission, or that such information would have made a difference to them. And not only is this a purely individual issue, it asks the Court to make new law: No case or law in Hawai'i requires a life insurer to disclose the broker's commission to the broker's client. *See generally* Higgins Dec., Ex. B (commissions not included in information to be disclosed to annuity purchaser).

Plaintiffs next make the absurd argument that Midland is defrauding all seniors because it does not affirmatively tell them that it intends to make profits. FAC at 9-10. Plaintiffs of course offer no evidence that any senior actually believed Midland was not in business for profit or that Midland was making profits from something other than their premiums. Moreover, no law or case requires a business to tell customers how it is making its profits.

Supposed Uniform Misrepresentations: Plaintiffs say Midland documents misrepresent the facts with the following statements: "Since there are no initial sales charges or fees, your entire premium is working for you, immediately earning tax-deferred interest." FAC, at 11. This statement cannot be actionable for any class member unless he can prove he actually read it and actually relied on it, in the individualized context of his discussions with his broker, and how it caused him

– 18 –

injury.  But the inquiry need not go that far, for each statement is <u>absolutely true</u>:
Midland credits interest in both the fixed account and the index account based on
every penny of premium, precisely according to the terms of the customer's
contract.  *See* TeKolste Dec., Exs. E-I; Lyons Dec., ¶11.  No fees and no charges
are deducted from the owner's accumulation value, and interest is paid on the
entire amount of the account balance.  *Id.*

Plaintiffs next speculate that "seniors will readily assume that '100%
participation' means that all of their premium is at work."  Pls. Mem., p. 10.  What
any given senior will "assume" depends upon what his broker told him, what he
read, and what he understood from this combination of information.  And, of
course, 100% of the premium *is* earning interest.  Plaintiffs cannot base class
certification on <u>true</u> statements.

<u>Surrender Charges</u>:  Plaintiffs vaguely suggest that Midland somehow
misrepresents surrender charges, but even Plaintiffs admit "the existence and
amount of the surrender charges is usually disclosed to some extent."  Pls. Mem.,
p. 12.  In fact, the surrender charges are highlighted on all of Midland's disclosure
documents and on the very first specifications page of each contract.  TeKolste
Dec., Exs. E-I, U-W.  Equally important, brokers most often explain surrender
charges to their clients, as occurred in Plaintiffs' transactions.  Buck Dec., ¶25;
Teruya Dec., ¶¶ 7, 11, 14.  Any class member hoping to establish liability on
Plaintiffs' theory would have to prove that for some reason she did not receive this
oral and written information, or that despite all this information, she did not

understand the charges, and that she was injured as a consequence.  Those are purely individual issues.

Index Margin:  Plaintiffs speculate that seniors might believe that the index margin works differently than how it is described in Midland's brochures and contracts.  Once again, whether any senior was confused in that way would be the product of his personal experience, mental acuity, attention to the documents, and the clarity of the conversations with his broker.

Midland's Right To Change Renewal Rates:  Plaintiffs contend that Midland does not disclose that it retains the right to change fixed account interest rates and index account margins after the first policy anniversary.  Pls. Mem., p. 17.  In fact, many annuity owners already understand that – just like a savings account or CD – future rates credited likely will change with changes in the financial markets. Buck Dec., ¶29.  In fact, brokers routinely explain to their customers, typically in plain English oral conversations, that the future interest rate crediting and stock market interest crediting rates are subject to change by Midland.  *Id.*; Teruya Dec., ¶¶8, 12, 15.  And in fact, Midland receives very few complaints, if any, when it changes credited interest rates.  Gioffredi Dec., Ex. E.  Here once again, Plaintiffs cannot show any nondisclosure:  Midland's documents state that these rates may change.  For example, Midland's disclosures state the Index Margin "is guaranteed for the first year and is set in advance each year thereafter," and the fixed account rate "offers a declared rate for the first year and then provides a renewal rate thereafter."  TeKolste Dec., Ex. T.  Similar language appears in the very exhibits

Plaintiffs attached to and relied upon for their class certification motion. *Cf.*
Plaintiffs' Ex. 11 *and* TeKolste Dec., Ex. R.

Interest Adjustment: Plaintiffs finally theorize that Midland's "interest
adjustment" is too complicated and therefore qualifies as deceptive under HRS
Section 480-2. Once again, Plaintiffs can reach this conclusion only by assuming
that all Hawaii seniors are the same, that none of them could understand the
interest adjustment formula, that their brokers did not summarize the interest
adjustment, and that an understanding of the interest adjustment would have
altered their decision to enter into the FIA contract. Such sweeping and unfounded
generalizations about all seniors cannot be the basis for class certification.
Moreover, this issue is a true red herring: none of the named Plaintiffs has ever
been subject to an interest adjustment, and overall the interest adjustment has paid
a net benefit to Hawai'i seniors. TeKolste Dec, Ex. MM.

### 3.     Dr. McCann's Flawed Opinions Do Not Eliminate The Individual Issues From Class Members' Claims

Given the individual factors woven through their "new" misrepresentation
arguments, Plaintiffs may try to change direction once again and argue that the
common issue is really that Midland FIAs are an inferior deal for every single
Hawai'i senior, based solely on Dr. McCann's opinions regarding the undefined
"value" of the FIAs. The Court should reject any such theory, for multiple reasons.

First, Dr. McCann can reach his conclusions only by making the absurd
assumption that each of the following attributes of Midland's FIAs has zero value
to each and every senior that ever purchased one:

- The guarantee that the annuity will not lose principal

- The death benefit – payment of full accumulation value even during the surrender charge period – to the owner's beneficiaries

- Tax deferral of all credited interest until the annuity is paid

- The annual reset feature on FIAs employing that feature

- The option to reallocate premium between the fixed account and index account on each contract anniversary

- Nursing home confinement and terminal illness riders

- The 10% annual penalty-free withdrawal

- The right to annuitize at any time after the first anniversary

- The guarantee that the annuity will not lose principal

- The personal financial and risk consulting services of the broker

- [Keeley Dec., ¶¶21; Higgins Dec., Ex. A]

In fact, each of these features has economic value. Keeley Dec., ¶¶17, 21-24, 50. More important, the value to each putative class member of each of these attributes presents precisely the kind of individual issues – such as security, predictability, desires to pass assets to heirs – that Judge Seabright has already determined cannot be resolved via a class action. *Id.*; Buck Dec., ¶8.

Moreover, the Court must reject Dr. McCann's declaration because it is just plain wrong. As explained in the Declaration of Michael Keeley, Dr. McCann's model – on which he bases all his opinions critical of Midland FIAs – improperly assumes parameters such as participation rates and index margins less favorable to the FIAs' performance, instead of using the actual rates in Midland's Hawai'i contracts. Keeley Dec., ¶16. Only by employing such false assumptions can Dr. McCann opine that "[t]he value of $100 invested in Midland's EIAs, including

– 22 –

the value of any guarantee, was between $70 and $85 at the time of purchase," or that Midland FIAs have lower expected returns and more risk than alternative investments. McCann Dec., ¶¶19(c), 20. In fact, Midland's FIAs will outperform Dr. McCann's alternative portfolio much of the time, at lower risk. Keeley Dec., ¶¶14-17. Dr. McCann further incorrectly assumes Midland imposes surrender charges on death benefits (McCann Dec., ¶¶ 14, 17(b)); he presumes, without foundation, to opine on what is misleading and fully disclosed, and what consumers will and will not understand and consider material (*e.g., id.*, ¶¶ 7, 10, 12, 17(b), 18, 19); and he misleadingly assumes the worst case scenarios. *Id.*, ¶¶ 25, 29. In short, he has allowed himself to become an advocate. Dr. McCann's entire analysis therefore is misleading and inadmissible. *See* Objection To and Motion To Exclude Declaration of Craig J. McCann.[3]

---

[3] Midland anticipates that Plaintiffs will invoke the recent decision of a District Court in California to certify an annuity class action based on a declaration submitted by Dr. McCann. In *Negrete v. Allianz Life Ins. Co. of North Am.*, No. CV05-6838 (C.D. Cal. Nov. 21, 2006) Judge Snyder certified a class alleging RICO violations against Allianz, one of Midland's competitors, based on annuities very different than Midland's FIAs. There, defendant Allianz made the tactical decision not to depose Dr. McCann nor to directly challenge his opinions or models in detail. Accordingly, Judge Snyder expressed "skepticism" that Dr. McCann's model is supportable, and concluded, "[i]f further development of the litigation brings forth evidence that seriously undermines plaintiffs' contentions, then decertification may be appropriate."

Here, the Court has the evidence Judge Snyder sought, for Midland has deposed Dr. McCann and has asked an expert to examine his work. That evidence proves that at least as to Midland's FIAs, Dr. McCann's opinions indeed are unsupportable. Moreover, this case is very different than *Negrete* because here the Plaintiffs' suitability claims occupy center stage. The *Negrete* certification order thus provides no comfort to Plaintiffs here, for they still must show that common issues predominate over the given individualized suitability issues, and the opinions on which they rely are demonstrably unreliable.

Finally, any "bad deal" theory has no legal support.  Evidence that there is some uniformly better alternative in the marketplace (and there is no such evidence here) does not make a product illegal, does not provide grounds for damages or rescission of the contract for the product, and does not mean the product seller has to disclose the alternative product to its customer.  No case or law holds that a party can walk away from a contract when it later determines that there were better alternatives in the marketplace.  If that were the law, then selling mutual funds with up-front loads, checking accounts with fees, and Fiat cars all would be illegal.

Thus, to grant certification based on Dr. McCann's opinions, the Court must conclude: (1) McCann's "value" analysis is correct despite his false assumptions; (2) no individual senior would give any value to the broker's services or the principal guarantees, insurance features, and other attributes of Midland FIAs; (3) seniors who knew of their broker's commissions, surrender charges and material terms of the FIAs were incapable of understanding their financial implications; (4) as a matter of law, an insurance contract is fatally unfair or deceptive when its financial terms are surpassed by some hypothetical portfolio not readily available; and (5) Dr. McCann's evidence creates a common issue predominating over all individual issues.  The Court should not certify a class action based on such a house of cards.

### 4.   Plaintiffs' Own Claims Show Individual Issues Predominate

The cases of the three Plaintiffs emphatically demonstrate the individuality of each class member's situation.

Edna Yamane. Ms. Yamane (or more precisely, her daughter) contends that Mr. Teruya induced the Yamanes to meet him at the bank where Teruya persuaded them to withdraw their "entire life savings" and put it in Midland FIAs. Oliver Dec., Ex. J. Yet when Mr. Yamane died in 2004, Ms. Yamane chose not to exercise her right to liquidate her annuities, thereby ratifying all transactions. *Id.*, Ex. A at 45:12-47:13; Ex. F. She has withdrawn over $10,000 without paying any surrender charge. *Id.*, Ex. A at 44:20-45:4; 47:17-52:7, 57:3-12; Exs. G, H and I. To date, Ms. Yamane has realized tax-deferred gains of over $13,500 on her annuities, all without risk those gains will drop if the equity markets falter.

Catherine Thorson. Ms. Thorson is a diligent, educated and sophisticated investor who already owned several other annuities when she purchased her Midland FIA. Ms. Thorson asked Mr. Teruya prepared questions; they went over the documents; and though she understood her FIA had surrender charges she assumed they were only for seven years. *Id.*, Ex. K at 20:6-20, 39:1-40:16, 46:9-48:22, 48:10-49:5. She admitted that the ability to withdraw money "wasn't that important" to her, she thought her annuity was suitable for her, and she decided not to return the annuity during the free look period because she was satisfied with it. *Id.* at 52:11-53:7, 54:25-55:9, 66:3-18; 68:25-69:17; 89:5-17; Ex. O. She started with 100% of her premium in the fixed account, but in 2004 she allocated 50% to three index accounts. *Id.*, Exs. N and T at MNLY015564 She has since withdrawn over $16,000 – without penalty. *Id.*, Ex. K at 71:7-72:5; 96:21-97:20, 101:5-103:9; Exs. R and S. Although she believed her annuity had lost value (*id.*, Ex. O), in fact she has ***earned*** over 5% on her premiums. *Id.*, Ex. T.

Leatrice Yokoyama.  The late Norman Yokoyama consulted Mr. Teruya because he did not like how some of his investments had been performing.  One of his objectives was to provide a steady stream of income for Leatrice Yokoyama in the event of his passing.  Teruya Dec., ¶ 6.  After her husband's death, Leatrice Yokoyama cashed in two annuities at full accumulation value – coming out ahead about $1,800 after just over a year – and paid no surrender charges.  Oliver Dec., Ex. W at 34:9-17; 37:9-13; 50:21-51:2; Ex. BB.  She maintains a third annuity and has chosen to take no withdrawals from it.  Id., Ex. W at 51:12-52:7.

Each of these individuals made money from their Midland FIA.  None incurred any fee or charge.  None has offered any evidence that they (or their husband) read any of the supposed misrepresentations, that any fact was not disclosed, or that any supposed undisclosed fact would have made a difference to them.  Yet, according to Plaintiffs, the Court should ignore the specific facts of their transactions and instead simply presume they were misled identically.  The Court should reject that artificial approach, and reaffirm its denial of class certification because individual issues predominate.

**C.    Plaintiffs Do Not, And Cannot, Satisfy Rule 23(b)(3)'s Superiority Requirement Because Individual Resolution Of Their Claims Is Far Superior To Addressing These Disparate Transactions On A Class Basis**

A separate but equally fundamental reason to deny certification is that Plaintiffs do not prove class resolution to be *superior* to other available methods of adjudication.  Fed. R. Civ. P. 23(b)(3).  In determining superiority, the Court must consider, among other things, "the difficulties likely to be encountered in the management of a class action."  Fed. R. Civ. P. 23(b)(3)(D); *see, e.g., Castano v.*

*American Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996) (a court, in its predominance analysis, must consider how a trial on the merits would be conducted). It is incumbent upon plaintiffs, and not the court, to design a workable plan for trial embracing <u>all</u> claims and defenses prior to certification. *See Chin v. Chrysler Corp.*, 182 F.R.D. 448, 459 (D. N.J. 1998).

In response to a similar attempt to certify a life insurance sales practice case, the *Van West* court found individual adjudication superior:

> Because individualized proof would be required to establish: 1) what verbal misrepresentations, if any, were made to each class member, 2) whether the persons making those representations were agents of Midland, 3) whether and to what extent each class member justifiably relied on the alleged misrepresentations, and 4) what damages each class member suffered, a class action would not contribute to the fair and efficient resolution of the claims asserted. On the contrary, it would do little more than superimpose the considerable management problems inherent in class action litigation upon the trials of individual claims by members of the putative class. [*Van West, supra,* 199 F.R.D. at 454]

Just as in *Van West*, a class action would not contribute to "the fair and efficient resolution" of Plaintiffs' claims here. First, because this Court's prior order denying class certification, Plaintiffs' burden of showing superiority is particularly great. Plaintiffs must prove that class resolution of misrepresentation claims and individual resolution of intertwined suitability claims is superior to the conventional individual resolution of the claims of each person actually motivated to bring a lawsuit. Because such persons' annuity sales arose from the presentations and recommendations of their independent brokers, such persons in a class action would have to either relinquish or sever into some separate proceeding their related cases against their brokers. That would be neither fair nor efficient.

*See In re Northern Dist. Cal. Dalkon Shield IUD Prod. Liab. Litigation,* 693 F.2d 847, 856 (9th Cir. 1982) (claims against doctors render class action against manufacturer unmanageable; certification order reversed).

Second, class action treatment would make resolution of these issues much less manageable. Plaintiffs do not explain how the Court will actually resolve all the putative class members' disparate claims, and they submitted no trial plan, which is reason alone to deny class certification. In fact, resolution of each class member's claims would involve determinations of each class member's personal and financial status, communications between each broker and each class member at the point (or more likely, points) of sale, each class member's reliance, and whether the class member sustained any compensable loss. Complete resolution thus would involve over 900 mini-trials, hardly an efficient, much less "superior" means of resolution.

Third, class resolution of every deferred annuity transaction between a senior and Midland over the span of four years would be neither just nor sensible. Most of Midland's senior policyholders appear satisfied with their purchases. Gioffredi Dec., ¶ 21. Of the over 900 senior policyholders, fewer than 20 have complained to Midland about their annuities or their broker's conduct. *See* Gioffredi Dec., Ex. E. Forcing adjudication of a contract between two parties who are content with their contract is the opposite of justice, and defies common sense.

Fourth, effective claim resolution procedures already exist. The first is Midland's own complaint resolution procedure, which fairly resolves issues presented by policy owners nationwide. Gioffredi Dec., ¶¶ 19-21, Ex. E. The

policyholder may also take her case to the Hawai'i Insurance Division, which investigates, adjudicates, and resolves claims against insurance companies. *See* HRS §431:2-203. Of course, any policy owner may bring a civil action. Truly aggrieved putative class members have plenty of incentive to pursue meritorious cases individually: the average premium of Midland annuities sold to seniors in Hawai'i exceeded $50,000, Chapter 480 allows attorneys' fees and even treble damages. *Thorn v. Jefferson-Pilot Life Ins. Co.,* 2006 WL 561505 (4th Cir. 2006) (availability of punitive damages and attorneys' fees recovery gives incentive for plaintiffs to pursue modest dollar claims; class action accordingly not superior).

Classwide treatment of these annuity-related claims is thus demonstrably inferior and unworkable. Plaintiffs cannot sustain their burden on this core requirement for certification.[4]

## V. CONCLUSION

Plaintiffs are asking the Court to lump their claims into one case, and mandate that the outcome of that one case dictate, and forever alter, the contractual relationships between Midland and <u>every</u> Hawai'i senior FIA owner over a five year period, no matter what the circumstances are, how rich the returns on any

---

[4] The Court should, finally, deny the motion because Plaintiffs do not carry their burden of showing typicality or adequacy under Rule 23(a). Plaintiffs' individual stories and claims is markedly different, so their claims are not typical of putative class members and they are not adequate class representatives. Moreover, all Plaintiffs have made money and none has incurred any charges. *See Valentino v. Carter-Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir. 1996) (no typicality where class representative claims different injuries from those suffered by other class members); *Hurd v. Monsanto Co.,* 164 F.R.D. 234, 238-39 (S.D. Ind. 1995) (no typicality where there is no one set of operative facts establishing liability, exposure, or susceptibility to injury).

particular individual's contract, and how satisfied the individual might be.  For the reasons stated above, the Court should again deny certification.

      DATED:  November 27, 2006.

                    REED SMITH LLP


By    */S/ Marshall C. Wallace*
           Marshall C. Wallace
           Attorneys for Defendant
           Midland National Life Insurance
           Company

DOCSOAK-9853300.9