IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| GARY YOKOYAMA, attorney-in-fact ) | CIVIL NO.  05-00303 JMS/KSC |
| for Leatrice C. Yokoyama; ) | |
| CATHERINE THORNSON; and ) | |
| EDNA YAMANE, by her attorney-in- ) | |
| fact Kathleen Maeda, individually and ) | |
| on behalf of a Class of Similarly ) | |
| Situated Persons, ) | ORDER ACCEPTING IN PART |
| ) | AND REJECTING IN PART |
| Plaintiffs, ) | MAGISTRATE JUDGE'S FINDINGS |
| ) | AND RECOMMENDATIONS |
| vs. ) | REGARDING EXPERT |
| ) | TESTIMONY AND CLASS |
| MIDLAND NATIONAL LIFE ) | CERTIFICATION |
| INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**ORDER ACCEPTING IN PART AND REJECTING IN PART
MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS
REGARDING EXPERT TESTIMONY AND CLASS CERTIFICATION**

## I. INTRODUCTION

Leatrice Yokoyama, Catherine Thornson, and Edna Yamane

(collectively "Plaintiffs") move for class certification in an action alleging

violations of Hawaii Revised Statutes ("HRS") § 480-2 in the sale of annuities and

claiming treble damages and attorneys' fees under HRS § 480-13(b).  As part of

their motion, Plaintiffs rely on the testimony of Dr. Craig McCann.  Defendant

Midland National Life Insurance Company ("Midland") opposed Plaintiffs'

Motion for Class Certification and moved to strike Dr. McCann's testimony.

Magistrate Judge Kevin S.C. Chang issued two separate Findings and

Recommendations -- denying Midland's Motion to Strike Dr. McCann's

Testimony and granting Plaintiffs' Motion for Class Certification.  For the

following reasons, the court ACCEPTS the Magistrate Judge's Findings and

Recommendations denying Midland's Motion to Strike Dr. McCann's Testimony

and REJECTS the Magistrate Judge's Findings and Recommendations granting

class certification.

## II.  __BACKGROUND__

**A.     Factual Background**

Plaintiffs are senior citizens residing in Hawaii who purchased

Midland indexed annuity products ("IAPs")[1] from independent brokers Mark and

Rhoda Teruya.  Generally speaking, annuities are insurance contracts which

provide tax deferrals of credited interest until the gains are distributed.  Midland

has sold over 900 IAPs to Hawaii seniors.  Plaintiffs filed suit claiming that

Midland's IAPs are inherently deceptive, misleading, and fraudulent under Hawaii

law.  Discovery in the matter is still ongoing; the facts as stated below are based

---

[1]  Plaintiffs refer to the annuity products as "Equity Indexed Annuities" or "EIAs."
Midland refers to the annuity products as "Fixed Indexed Annuities" or "FIAs."

2

on the record as developed at this stage.

### 1.   *Indexed Annuity Products*

Over the relevant class period, Midland sold thirteen different IAPs to senior citizens in Hawaii, the terms of which vary.  After selecting a specific IAP to purchase, a consumer further individualizes his or her chosen IAP by selecting one of five "index accounts," such as Standard & Poor's 500 Composite Stock Index or the Dow Jones Industrial Average, to link to the IAP.[2]  The consumer then allocates[3] his or her investment premium between the "fixed portion" of the IAP (in which Midland guarantees an interest credit at a specified rate) and the "indexed portion" of the IAP (in which Midland credits an interest percentage based on any annual gain experienced by the selected stock market index less a certain percentage variable called an "index margin," which Midland subtracts for profit or service fees).[4]  Each Midland IAP sales contract guarantees a minimum

---

[2]  All but one of the IAPs at issue credit equity-linked interest on an annual basis; once credited, the interest is added to the accumulation value of the annuity.  Keely Decl. ¶ 12.

[3]  The consumer has the option to reallocate his or her investment premium between the fixed and indexed portions on each contract anniversary.

[4]  The index margin is a percentage deduction of the percentage gain experienced by the selected stock market index.  Thus, in a year where the S&P 500 experienced a gain of 7 percent, an index margin of 4 percent would mean that the annuity holder receives an interest credit of 3 percent applied to funds held in the indexed portion.  In years where the selected stock market index declines, individual purchasers do not suffer a loss; instead, they simply are not credited with any interest on the indexed portion.

cash value regardless of account performance, interest adjustments, or surrender charges.

### 2. *Midland's Power to Decrease Amount of Interest Paid*

Midland may, in its discretion, decrease the amount of interest credited to an individual's annuity by lowering the rate of the interest applied to funds held in the fixed portion; increasing the index margin applied to the indexed portion; or applying a cap on the indexed interest credited to the account. Twelve of the IAPs allow changes to the fixed interest on an annual basis: The interest rate earned on the fixed portion of an IAP is set at a declared rate in the first year, but re-set in subsequent years, subject to a guaranteed minimum rate. *See* TeKolste Decl. Ex. T; Lyons Decl. ¶ 5. Similarly, the index margin "is guaranteed for the first year" but will be "set in advance each year thereafter." TeKolste Decl. Ex. T. Finally, the indexed interest may be capped at a certain rate.[5] Lyons Decl. ¶ 8. In short, after the first year, Midland has the power to set the various interest rates and index margins within a stated maximum or minimum.

Midland discusses these interest rates -- and its power to change them

_____

[5] The different IAPs also incorporate different methods for crediting the interest from the indexed portion, including annual point to point, monthly point to point, and daily averaging crediting methods. *See* Lyons Decl. ¶¶ 6, 7. The crediting method selected may affect the interest index caps.

-- in its published materials.  *See* TeKolste Decl. Exs. R, T; Pls'. Ex. 11.

Independent brokers also discuss the fact that the interest accrual rates and index

margin will change.  Buck Decl. ¶ 29; Teruya Decl. ¶¶ 8, 12, 15.  One independent

broker also puts calculations of  "worst case scenarios" in writing for his clients.

Buck Decl. ¶ 28.

### 3.   *Surrender Charges*

Each Midland IAP contains a specific maturity date.  Prior to the

maturity date, individual IAP holders are contractually authorized, on an annual

basis, to withdraw a certain percentage of their annuity fund without penalty.[6]

However, Midland imposes a "surrender charge" penalty for the early withdrawal

of funds or for a withdrawal of funds in excess of that permitted under the

---

[6]  An annuity holder may withdraw funds without incurring surrender charges in several ways.  First, commencing on the first anniversary of the annuity contract, the annuity holder may withdraw up to 10% of the accumulation value (consisting of the entire premium plus any interest earned) without penalty.  Gioffredi Decl. ¶¶ 6, 10.  Second, all of the relevant IAPs offer a contract rider which allows the annuity holder to withdraw 20% of the accumulation value annually in the event of confinement to a nursing home and two of the IAPs allow the holder to withdraw 50% of the accumulation value of the annuity in the event of a terminal illness. Gioffredi Decl. ¶ 17, Exs. B, D; Lyons Decl. ¶ 8(g).  Third, after the first anniversary of the annuity contract, the annuity holders may elect to convert the accumulation value of their accounts to an annuitized stream of payments (occurring in contracted amounts and intervals). Gioffredi Decl. ¶ 13.  Finally, all of Midland's IAPs provide for the payment of the full accumulation value to the annuity beneficiary upon the death of the annuitant.  Gioffredi Decl. ¶¶ 14-15.

individual annuity sales contract.[7]

Midland's surrender charges have the potential to decrease the total value of funds returned to the early-withdrawing annuitant in two ways. First, there is the penalty itself. Second, prior to the early withdrawal of funds and the subtraction of the surrender charge, the accumulation value of the account is multiplied by an interest adjustment factor, which according to the Plaintiffs is "a number always less than one if Midland has not reduced its annuity interest rates since issuance." Pls'. Mot. for Class Certification 15. In some cases, annuitants who seek to withdraw their funds prior to the maturity date of the contract would receive an amount less than what they invested. McCann Decl. ¶¶ 24-31.

Midland's published materials disclose the surrender charges in multiple places. For example, disclosure of the surrender charge is included in Paragraphs 6.2 and 7.3 of each annuity sales contract. *See* TeKolste Decl. Exs. E-I. Second, the surrender charges appear to be summarized in a "specifications page" for each annuity contract. *Id*. Third, since 2003, Midland has required individual purchasers to complete an application and disclosure form; to provide

---

[7] Plaintiffs claim that Midland's surrender charges understate the true cost of an early cancellation of an IAP and were designed to conceal from the individual purchaser the real rate of return on his or her investment. Midland responds that surrender charges are necessary because Midland requires a stable pool of funds to invest in long-term portfolios in order to provide the rate of return guaranteed to the annuity holders.

certain financial disclosures regarding the suitability of an IAP; and to initial the

following language:

> I understand that the [name of annuity] is a long-term contract
> with substantial penalties for early surrenders.  A surrender
> charge is assessed (as listed below) on any amount withdrawn,
> whether as a partial withdrawal or full surrender, that is in
> excess of the penalty-free amount applicable.  The surrender
> charges are for [number] of years and decline as follows: [table
> of surrender charge percent by year].  These liquidity
> provisions are suitable for my financial needs, such as cash for
> living and other related expenses.  This contract is suitable for
> my financial needs.

TeKolste Decl. ¶ 49; *see also id.* ¶ 44, Ex. U; Lyons Decl. ¶ 8(a).[8]  Independent

brokers also include detailed explanations of the surrender charges in their oral

presentations.  Buck Decl. ¶¶ 8, 18, 19, 25; Teruya Decl. ¶¶ 7, 11, 14.  At least one

individual broker selling Midland IAPs prepared separate flyers which mentioned

the surrender period for clients.  Buck Decl. ¶ 16, Ex. B.

### 4.    *Independent Brokers*

Midland does not employ an IAP sales team and does not offer its

IAPs directly to the public.  Instead, it relies on independent brokers to sell its

IAPs.  These independent brokers come from a variety of backgrounds: some hold

professional licenses, such as securities licenses or CPAs and some do not.

---

[8]  The record does not indicate what surrender disclosures were included in pre-2003
materials.

Midland does not train its independent brokers; instead, they may obtain their own training through agencies, state licensing processes, private educational companies, and other professional experience.  The independent brokers also work in different ways.  Some work individually, others through agencies, and still others have established separate entities through which they sell Midland IAPs.  The independent brokers usually offer a range of financial services and products in addition to the Midland IAPs.

Midland provides its independent brokers with product brochures and disclosure forms to use at the point of sale.  The independent brokers are required to provide consumers with these forms and consumers must verify that they have received these materials before Midland will execute the annuity sales contract.  Midland also requires its independent brokers to certify that they have not said anything inconsistent with the content of these materials.  Beyond this, however, independent brokers are free to discuss, promote, or disparage the Midland IAPs as they see fit.  Midland does not provide its independent brokers with a script, sales pitch, or content for oral presentations.  According to Edwin Buck, an independent broker and President of E.A. Buck, Co., Inc.,[9] the communications

---

[9] E.A. Buck, Co., Inc. employs other independent brokers who sell annuity and life insurance products, including Midland's IAPs.

8

and sales presentations by independent brokers -- including whether or not the independent broker recommends a Midland IAP -- are unique to the needs, background, and financial condition of the client.  *See* Buck Decl. ¶¶ 8, 9, 22, 24. Buck also prepared and distributed his own unique written materials and handouts explaining the terms of Midland IAPs.  *See* Buck Decl. ¶ 16, Ex. B.

### 5.     *Sales Commissions*

There is some disagreement as to how the independent brokers are compensated.  It is clear that they are paid a sales commission, which Midland admits is somewhere between 9 and 10 percent.  However, Plaintiffs argue that the commissions for certain IAP products are actually much higher and, as support, offer testimony from an independent broker who claims to have received a sales commission as high as 16 to 18 percent.

Plaintiffs allege that Midland subtracts the sales commission fee paid to independent brokers from the individual annuitant's premium, resulting in a decreased account value at the time of investment.[10]  In response, Midland claims that it credits interest for the full amount of the invested premium (and not, as Plaintiffs imply, based on the premium less sales commission).  *See* TeKolste

---

[10]  Plaintiffs thus claim that Midland's sales brochures, which state that "since there are no initial sales charges or fees, your entire premium is working for you, immediately earning tax-deferred interest," falsely represent the amount of the consumer's investment.

Decl. Exs. E-I; Lyons Decl. ¶ 11.

## B.  Procedural Background

Plaintiffs filed suit in 2005 claiming that, given their surrender periods and charges, IAPs were unsuitable for seniors.  Plaintiffs moved for class certification as to their Second Amended Complaint in early 2007.  This court denied class certification, finding that individual rather than common issues predominated, but gave Plaintiffs leave to seek class certification after filing an amended complaint.

Plaintiffs have since filed a Fourth Amended Complaint alleging that the IAPs sold by Midland in Hawaii are inherently deceptive or unfair products; that Midland has failed to include in its standard form IAP contracts, sales illustrations, and related marketing publications all material facts necessary to inform prospective senior citizen IAP purchasers of the true risks of the products; that Midland failed to include in its IAP contracts, sales illustrations, and related marketing materials all information necessary to inform consumers of the sales charges; that Midland's IAPs contain terms and conditions that prevent consumers from being able to understand the attendant costs and risks; that Midland has failed to properly train and supervise its annuity sales force to adhere to Hawaii law and Midland's own internal policies and procedures in connection with the

10

sales of IAPs to senior citizens; and that Midland makes false representations that its IAPs protect clients from the risks of the stock market, all of which violate HRS § 480-2 and thus entitle Plaintiffs to treble damages under HRS § 480-13. Plaintiffs moved for class certification as follows:

> [A]ll persons residing in Hawaii who from May 3, 2001 to the May 3, 2005 date of the filing of the Complaint herein (the "Class Period"), and while age 65 years or older, purchased a Midland [IAP] either directly or through the surrender (whole or part) of an existing permanent life insurance policy or annuity, or by borrowing against an existing permanent life insurance policy, which annuity had a rate of return dictated by a specific market "index."

Magistrate Judge Kevin S.C. Chang issued a Findings and Recommendations granting Plaintiffs' Motion for Class Certification and denying Midland's Motion to Strike Dr. McCann's Testimony.  Midland timely appealed and, after briefing, the court heard oral arguments on May 14, 2007.

## III.  STANDARDS OF REVIEW

### A.    Magistrate Judge's Findings and Recommendations

The court conducts a de novo review of a magistrate judge's findings and recommendations granting class certification.  28 U.S.C. § 636(b)(1) (the court makes "a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made"); *United*

*States v. Raddatz*, 447 U.S. 667, 673 (1980); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) ("[T]he district judge must review the magistrate judge's findings and recommendations de novo if *objection is made*, but not otherwise.").  De novo review requires the court to consider the matter anew, as if it had not been heard before and as if no decision previously had been rendered.  *United States v. Silverman*, 861 F.2d 571, 576 (9th Cir. 1988).  The district court must arrive at its own independent conclusion about those portions of the magistrate judge's findings or recommendation to which a party objects.  *United States v. Remsing*, 874 F.2d 614, 616 (9th Cir. 1989).  Ultimately, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).

**B.    Federal Rule of Civil Procedure 23**

The court must perform a "rigorous analysis" as to whether the requirements for class certification set forth in Federal Rule of Civil Procedure 23 have been met.  *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982).  As the party seeking certification, the Plaintiffs bear the burden of setting forth facts sufficient to satisfy the requirements of Rule 23.  *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1309 (9th Cir. 1977).

When considering a motion for class certification, the court accepts

the allegations as pled in Plaintiffs' Complaint as true. *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975). The court thus does not consider whether the Plaintiffs have stated a cause of action or whether they are likely to prevail on the merits. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). However, the court may consider evidence that relates to the merits if such evidence also goes to Rule 23's requirements. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). If the court finds that the Plaintiffs have met their burden of proof as to the requirements of Rule 23, the court may, in its broad discretion, certify the class. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

## IV. <u>ANALYSIS</u>

Plaintiffs seek class certification alleging violations of HRS § 480-2 and claiming damages under HRS § 480-13(b). To succeed on a motion for class certification, Plaintiffs must meet all of the prerequisites of Federal Rule of Civil Procedure 23(a) and one of the requirements of Federal Rule of Civil Procedure 23(b). *Zinser*, 253 F.3d at 1186.

### A.   **HRS §§ 480-2 and 480-13(b)**

Plaintiffs' claims for damages under HRS § 480-13(b) are predicated on Midland's alleged violations of HRS § 480-2. Under HRS § 480-2(a), "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of

13

any trade or commerce are unlawful."  HRS § 480-2(e) provides that "[a]ny person may bring an action based on unfair methods of competition declared unlawful by this section."  HRS § 480-13(b), in turn, provides:

> Any consumer who is injured by any unfair or deceptive act or practice forbidden or declared unlawful by section 480-2:
> (1) May sue for damages sustained by the consumer, and, if the judgment is for the plaintiff, the plaintiff shall be awarded a sum not less than $1,000 or threefold damages by the plaintiff sustained, whichever sum is the greater, and reasonable attorney's fees together with the costs of suit; provided that where the plaintiff is an elder, the plaintiff, in the alternative, may be awarded a sum not less than $5,000 or threefold any damages sustained by the plaintiff, whichever sum is the greater, and reasonable attorney's fees together with the costs of suit.  In determining whether to adopt the $5,000 alternative amount in an award to an elder, the court shall consider the factors set forth in section 480-13.5; and
> (2) May bring proceedings to enjoin the unlawful practices, and if the decree is for the plaintiff, the plaintiff shall be awarded reasonable attorney's fees together with the costs of suit.

Under the explicit statutory language of HRS § 480-13(b), only "injured" consumers have standing to bring suit for "damages sustained by the consumer."

"The elements necessary to recover on an unfair or deceptive trade acts or practices claim under HRS § 480-13(b)(1) are: (1) a violation of HRS § 480-2; (2) injury to the consumer caused by such a violation; and (3) proof of the amount of damages."  *Davis v. Wholesale Motors, Inc.*, 86 Haw. 405, 417, 949 P.2d. 1026, 1038 (Haw. App. 1998).

14

**B.      Federal Rule of Civil Procedure 23(a)**

Federal Rule of Civil Procedure 23(a) provides

Prerequisites to a Class Action.  One or more members of a
class may sue or be sued as representative parties on behalf of
all only if (1) the class is so numerous that joinder of all
members is impracticable, (2) there are questions of law or fact
common to the class, (3) the claims or defenses of the
representative parties are typical of the claims or defenses of
the class, and (4) the representative parties will fairly and
adequately protect the interests of the class.

*See also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000).

Midland objects to the Magistrate Judge's findings as to typicality (Rule 23(a)(3))

and adequacy of representation (Rule 23(a)(4)).  The court considers each

contested element in turn.[11]

---

[11]   The court finds that Rule 23(a)'s numerosity and commonality requirements are met.
Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is
impracticable." Fed. R. Civ. P. 23(a)(1).  "Impracticability does not mean 'impossibility,' but
only the difficulty or inconvenience in joining all members of the class." *Harris v. Palm Springs
Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) (citations omitted).  Here, there are
624 identified potential plaintiffs, the joinder of which would be impracticable.
        Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed.
R. Civ. P. 23(a)(2).  "The commonality test is qualitative rather than quantitative -- one
significant issue common to the class may be sufficient to warrant certification." *Dukes v. Wal-
Mart, Inc.*, 474 F.3d 1214, 1225 (9th Cir. 2007).  As the Ninth Circuit explains,

Rule 23(a)(2) has been construed permissively.  All questions of fact and
law need not be common to satisfy the rule.  The existence of shared legal
issues with divergent factual predicates is sufficient, as is a common core
of salient facts coupled with disparate legal remedies within the class.

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

(continued...)

### 1.    *Typicality*

Rule 23(a)(3) permits certification only if the claims of the representative plaintiffs are "typical" of the proposed class.  Fed. R. Civ. P. 23(a)(3).  While "[c]ommonality examines the relationship of facts and legal issues common to class members, . . . typicality focuses on the relationship of facts and issues between the class and its representatives."  *Dukes v. Wal-Mart, Inc.*, 474 F.3d 1214, 1232 n.10 (9th Cir. 2007).  Under the "permissive" standards of Rule 23(a)(3), "representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  Thus,

---

[11](...continued)
In *In re First Alliance Mortgage Co.*, 471 F.3d 977, 990 (2006), the Ninth Circuit addressed the degree of commonality required under Rule 23(a)(2) for fraud claims:

> [w]hen the modern class action rule was adopted, it was made clear that "common" did not require complete congruence. . . .  While some other courts have adopted somewhat different standards in identifying the degree of factual commonality required in the misrepresentations to class members in order to hold a defendant liable for class-wide fraud, this court has followed an approach that favors class treatment of fraud claims stemming from a "common course of conduct."

Here, Plaintiffs allege Midland misrepresented, concealed, and failed to disclose relevant information regarding the true costs and risks associated with the IAPs in its published materials. The publication of sales material which allegedly misrepresents and conceals information from investors and Midland's instruction to the sales force to distribute this information as part of their sales presentations is a course of conduct common to all class members.  Rule 23(a)'s commonality requirement is thus met.

16

"[s]ome degree of individuality is to be expected in all cases, but that specificity does not necessarily defeat typicality." *Dukes*, 474 F.3d at 1232.

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same conduct." *Hanon*, 976 F.2d at 508 (internal quotes and citation omitted). The typicality test is satisfied when the claims of the class representatives stem from similar conduct on the part of the defendant and rest on the same legal or remedial theories as the claims of other class members.

The court finds that the claims of the named Plaintiffs and the potential class members rest on the same legal theories, namely unfair and deceptive trade practices under HRS § 480-2, and that Midland allegedly engaged in a common course of conduct of publishing misleading information. As such, the typicality requirement of Rule 23(a)(3) is satisfied.

## 2.   *Fair and Adequate Representation*

Rule 23(a)(4) allows certification only if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This factor requires: (1) that the proposed representative Plaintiffs do not have conflicts of interest with the proposed class, and (2) that Plaintiffs are

represented by qualified and competent counsel." *Dukes*, 474 F.3d at 1233.

The interests of the named Plaintiffs are sufficiently aligned with those of the class as a whole. The record does not reflect any conflicts of interest between the named Plaintiffs and members of the class. Furthermore, Midland does not argue that the Plaintiffs' counsel is unqualified to competently represent the interests of the class. As such, the requirements of Rule 23(a)(4) are met.

## C.    Federal Rule of Civil Procedure 23(b)(3)

Since the predominant form of relief sought is monetary damages, Plaintiffs must also satisfy the requirements of Rule 23(b)(3). *Besinga v. United States*, 923 F.2d 133, 135 (9th Cir. 1991); *Daly v. Harris*, 209 F.R.D. 180 (D. Haw. 2002). To certify Plaintiffs' claims under Rule 23(b)(3), the court must

> find that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular form; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3). The requirements of Rule 23(b)(3) are more stringent

than those set forth in Rule 23(a).  As one court has noted,

> [w]hile the mere existence of some common issues may satisfy the commonality requirement of Rule 23(a), it is not sufficient to satisfy the requirements of Rule 23(b)(3).  Subsection (b)(3) requires that the common issues "predominate" over the issues unique to individual class members, and that a class action be superior to any other method of adjudication.

*Van West v. Midland Nat'l Life Ins. Co.*, 199 F.R.D. 448, 453 (D. R.I. 2001).  The court finds that the issues common to the proposed class do not predominate over individualized questions and that a class action is not the superior method of adjudicating the Plaintiffs' claims.

### 1.  Predominance

"The Rule 23(b)(3) predominance inquiry tests whether [the] proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  The predominance inquiry weighs issues common to the class against issues individual to class members.

As a preliminary matter, the court must ascertain the degree to which Rule 23(a)(2)'s common issues must prevail over individual differences in order to pass muster under Rule 23(b)(3)'s "predominance" standard.  The court finds that under the plain and ordinary meaning of "predominate," the common issues must

overshadow any individualized question.  *Accord Stott v. Haworth*, 916 F.2d 134, 145 (4th Cir. 1990) ("Class certification is only proper when a determinative critical issue overshadows all other issues."); *Van West*, 199 F.R.D. at 453 ("In determining whether common issues 'predominate,' the threshold question is whether those issues overshadow the issues that must be resolved separately for different members of the class.").

Plaintiffs argue that "the threshold and overriding question is whether Midland's sales of [IAPs] to seniors, when the actual operation of the [IAP] is compared to what the senior consumer is led to believe by both representations and omissions, is an unfair and deceptive trade practice."  Pls'. Mot. for Class Certification 28-29.  Plaintiffs' phrasing highlights some of the individualized questions implicated by their common claim: namely, that the actual operation of a Midland annuity is based on several variables unique to each individual class member and the question of what a senior consumer was led to believe depends on the unique and individual communications between the senior and the independent brokers.

After a review of the entire record, the court finds that the Plaintiffs' claims inevitably (1) involve separate questions of fact as to what information the independent brokers selling the IAPs conveyed to annuitants; (2) necessitate

20

examination of the individual damages actually sustained; (3) require inspection of whether the class members individually relied on Midland's misstatements; and (4) require that suitability claims be adjudged individually. Viewing the Plaintiffs' claims in the aggregate, the court cannot find that the common questions predominate or overshadow these highly fact-specific individual inquiries (each of which are unique to each proposed class member).[12]

### a.    Effect of individual oral presentations

Each sale of a Midland annuity is a highly individualized transaction. Independent brokers with different background and training give different sales presentations (based on the personal and financial circumstances of the client) and create different and unique written materials for their customers.[13]  These unique communications result in highly individualized choices as to whether to purchase an IAP, which IAP to purchase, which index or crediting method to select, how much to invest, how to allocate the investment premium, and the like.

Because some independent brokers did disclose, discuss, clarify, or

---

[12]  It is the cumulative impact of these individualized inquiries -- and not any one factor standing alone -- which defeats class certification under Rule 23(b)(3).  In fact, although these four factors are set forth separately in this Order, they often overlap and rely on common threads involving what was told to a particular investor regarding Midland IAPs; how (if at all) that investor was damaged by the IAP given her needs, financial condition, and the particular IAP product purchased; and whether the investor relied on Midland's alleged misrepresentation.

[13]  Some IAP customers also call Midland with questions.  *See* Gioffredi Decl. ¶ 4.

explain the relevant provisions to individual consumers -- even putting "worst

case scenarios" into writing -- an individual inquiry is required to determine the

impact of the oral presentation upon each investor, the behavior of the

independent broker, and the nature of the relationship between each individual

annuitant and his or her independent broker.[14]   Thus, while the Advisory

Committee Notes to the 1966 Amendments to Rule 23(b)(3) note, "[f]raud

perpetrated upon numerous persons by the use of similar misrepresentation may be

an appealing situation for a class action," the individual inquiry required by this

case renders Plaintiffs' claims ill-suited for a class action.[15]   *See Van West*, 199

F.R.D. at 454 ("To the extent that the alleged misrepresentations are contained in

literature disseminated by Midland to prospective buyers, a common issue is

presented because class-wide determinations could be made as to what

---

[14]   As an illustration, Ms. Yamane testified that she did not recall Teruya reviewing the Midland IAP details with either her or her husband and that Teruya went with Mr. Yamane to the bank on the date their savings CD expired so that he could transfer the cash to a Midland IAP. *See* Yamane Dep., attached as Oliver Decl. Ex. A at 31-32.  In contrast, Buck has, on average, three two-hour meetings with his clients over a span of two to three weeks -- in which he discusses his clients' basic assets and liabilities; financial needs and goals; health concerns; anticipated expenses; cash needs; other sources of income; and tax projections -- before he recommends a product portfolio (which could include a combination of registered securities, tax credit programs, deferred annuities, and the like).  Buck Decl. ¶¶ 10-14.

[15]   By so holding, the court does not mean to imply a per se rule that all cases involving individualized communication from independent brokers are unsuited for class actions.  In this case, however, Plaintiffs have failed to show the use of "similar misrepresentations" given the variety of sales techniques used by the independent brokers.

representations were made and whether those representations were false. However, to the extent that the alleged misrepresentations include different statements made to individual class members by a variety of agents or independent brokers, it would require proof of what each class member was told and the nature of the relationship between Midland and the particular agent or broker making the statements.").

        b.    *Claims brought under HRS § 480-13 alleging violations of HRS § 480-2 require an individualized showing of actual damages*

Since Plaintiffs are suing for financial redress under HRS § 480-13 based on alleged violations of HRS § 480-2, they are required to demonstrate actual damages.[16] *Jenkins v. Commonwealth Land Title Ins. Co.*, 95 F.3d 791, 799

---

[16] HRS § 480-2(b) directs that Chapter 480 shall be interpreted consistent with the rules, regulations, and decisions of the Federal Trade Commission and federal courts interpreting the Federal Trade Commission Act, 15 U.S.C. 45(a)(1). The Federal Trade Commission Act does not require individual proof of damages prior to the filing of suit. Similarly, the government does not have to wait for individual damages to be sustained prior to filing a cause of action under HRS §§ 480-8, 480-15, 480-16, or 480-18, and proof of damages may not be required when individual plaintiffs file suit seeking non-compensatory remedies under HRS § 480-2 or for injunctive relief under HRS § 480-7(b). Here, however, the Plaintiffs bring claims for damages under HRS § 480-13 predicated on alleged violations of HRS § 480-2. Claims for damages brought under HRS § 480-13 (even when predicated on violations of HRS § 480-2) are fundamentally different than claims for injunctive, declaratory, or other forms of non-compensatory relief brought under other sections of Chapter 480 and, as such, the court is not expressly bound by decisions finding that the Federal Trade Commission Act does not require proof of damages. *See Zanakis-Pico v. Cutter Dodge, Inc.*, 98 Haw. 309, 314 n.18, 47 P.3d 1222, 1227 n.18 (2002) ("Of course, the Federal Trade Commission Act, unlike HRS § 480-2, is enforced exclusively by a government agency, so the comparison, for the purposes of damages, is

(continued...)

23

(9th Cir. 1996); *De Coito v. Unifund Corp.*, 2004 U.S. Dist. Lexis 23729, at *23-

25 (D. Haw. 2004); *Sambor v. Omnia Credit Services, Inc.*, 183 F. Supp. 2d 1234,

1244-45 (D. Haw. 2002); *Balthazar v. Verizon Hawaii, Inc.*, 109 Haw. 69, 80, 123

P.3d 194, 205 (2005); *Ai v. Frank Huff Agency, Ltd.*, 61 Haw. 607, 618, 607 P.2d

1304, 1312 (1980), *overruled in part on other grounds by Robert's Haw. Sch. Bus,*

*Inc. v. Laupahoehoe Transp. Co.*, 91 Haw. 224, 982 P.2d 853 (1999).  Although

proof of actual damages is required, a claim for de minimis damages is sufficient

for standing under HRS § 480-13.  *See Wiginton v. Pac. Credit Corp.*, 2 Haw.

App. 435, 444, 634 P.2d 111, 118-19 (Haw. App. 1981) ("[T]he legislature was

aware that damages might be de minimis in a consumer protection action and

specifically provided for the $1,000 award or triple damages to cover that

possibility.").

        Midland first argues that Plaintiffs cannot demonstrate actual

damages because they did not actually lose their investment premium and instead

gained some rate of return.  The court rejects this argument: In an action for unfair

and deceptive business practices under HRS §§ 480-2 and 480-13, the proper

---

[16](...continued)
of limited utility and not expressly mandated by the statute."); *see also Courbat v. Dahana
Ranch, Inc.*, 111 Haw. 254, 261-62, 141 P.3d 427, 434-35 (2006) (applying federal authority as a
guide in interpreting HRS § 480 but noting that sustained economic damages gave rise to the
plaintiffs' claim under HRS § 480-13).

measure of damages is that which is necessary to put Plaintiffs in the position they would have been in had they not been defrauded, misled, or deceived.  *Zanakis-Pico v. Cutter Dodge, Inc.*, 98 Haw. 309, 319, 47 P.3d 1222, 1232 (2002); *Leibert v. Finance Factors, Ltd.*, 71 Haw. 285, 290, 788 P.2d 833, 836-37 (1990). Plaintiffs are thus not required to show that they lost money through their IAPs; under HRS § 480-13, Plaintiffs need only show that because of Midland's alleged fraud, they were in a worse position than they would have been in had they invested their money in a financial instrument not tainted by fraud.  For the sake of argument, the court accepts the damage modeling of Plaintiffs' expert Dr. McCann.[17]  Dr. McCann estimates that class members purchasing Midland IAPs receive an investment value of only $70-80 for each $100 invested, or that they

---

[17]  Midland moves to strike Dr. McCann's declaration on a number of grounds.  The Ninth Circuit recently addressed the standard for considering testimony at the class certification stage, holding that the proffered testimony need not meet the standards for expert testimony set forth in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceutical, Inc.*, 509 U.S. 579 (1993).  *See Dukes*, 474 F.3d at 1227.  Instead, the Ninth Circuit established "a lower *Daubert* standard should be employed" at the class certification stage.  *Id.*  Under the Ninth Circuit's reasoning in *Dukes*, district courts may consider expert testimony which forwards a "plausible" methodology or model.  The "plausibility" standard is one step below *Daubert's* "accepted" methodology.  Requiring something more than a plausible methodology would force the court to engage in the type of specific-merit based inquiry or *Daubert*-certification the court otherwise endeavors to avoid at the class certification stage under *Eisen* and *Dukes.  Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974); *Dukes*, 474 F.3d at 1227.
        Although the court has reservations about the methodology employed by Dr. McCann in modeling damages, for the purpose of this motion, the court finds Dr. McCann's methodology to be plausible.  The court therefore accepts the Magistrate Judge's Findings and Recommendations denying Midland's Motion to Strike Dr. McCann's Declaration.

sustain actual damages of approximately 20 to 30 percent.  McCann Decl. ¶ 20.

Dr. McCann's modeling thus establishes -- at least at the class certification stage --

that Plaintiffs have forwarded a claim for actual damages.

That Plaintiffs have articulated a claim for actual damages, however,

does not end the inquiry.  Instead, the court observes that while Midland's

allegedly unlawful practices of concealing decreasing interest rates, increasing

index margins, and misleading customers as to surrender charges are common to

the class, there are many individual questions which must be answered in the

course of calculating damages.  For example, the amount of damage sustained by a

single class member would depend on factors such as the financial circumstances

and objectives of each class member; their ages;[18] the IAP selected;[19] any changes

in the fixed interest rate for that particular IAP; the performance of the selected

index; any changes in the index margin for that particular IAP; any cap on the

---

[18]  The proposed class covers those 65 or older.  However, there is likely a fundamental difference in position between a 65 year-old who purchases a Midland IAP hoping to defer tax gains and protect the value of his premium and an 80 year-old doing the same.

[19]  Midland sold thirteen different types of IAPs to senior citizens in Hawaii during the relevant class period.  *See* Pls'. Exs. 11-41; Lyons Decl. ¶ 4.  The different types of IAPs were further individualized by the selection of different index accounts, the allocation of funds between the fixed and indexed portions, and the selection of crediting methods.  The choices made by the individual IAP holder thus affect the performance and return recognized by the IAP.

indexed interest; the length of the surrender periods;[20] whether the individual had

undertaken or wanted to undertake an early withdrawal of funds; any benefit the

individual policy holder derived from the form of the annuity itself, including the

tax-deferral of credited interest; and the actual rate of return on the IAP.[21]  Dr.

McCann's methodology, even if ultimately accepted, can only provide a general

calculation by which to account for some of these factors.  Moreover, it concerns

the court that the trier of fact would have to consider multiple calculations in order

to determine the actual damages sustained by each class member under his or her

unique circumstances.[22]  The damages calculation thus involves highly

individualized and fact-specific determinations, making class-wide adjudication

inappropriate for the present case.

---

[20]  The record reflects that the named Plaintiffs had different surrender periods: The IAPs of Ms. Yamane and Ms. Thornson contained surrender periods of fourteen years while the IAP of Ms. Yokoyama contained a surrender period of seven years.  As well, different IAPs may contain riders allowing the individuals to withdraw additional funds in the event of disability or confinement to a care facility.

[21]  One non-class member investor received a return of 34.9% on his IAP during a period when the Dow Jones Industrial Average declined 5.2%.  Buck Decl. ¶ 33, Ex. C.  According to Midland, during the relevant time period for class members, the annualized returns varied from 3.18% to 9.23% as a result of different purchase dates, contract types, selection of indices, and selection of different crediting methods.  Lyons Decl. ¶ 4, Ex. A.

[22]  As Plaintiffs' counsel admitted during oral argument, even the Plaintiffs' proposed calculation of damages would involve calculating the spread between the amount of monies actually earned by a class member's IAP and the amount of monies that would have been earned via another investment selection (this latter amount being determined by the application of a standard formula to approximately twenty-two different scenarios).  *See* May 14, 2007 Tr. 57-58.

c.    *HRS §§ 480-2 and 480-13 require a causal link*

In order for liability to be imposed under HRS § 480-13, Plaintiffs

must show that the damages sustained were a result of, or caused by, Midland's

violations of HRS § 480-2.  *See Jenkins*, 95 F.3d at 799 ("The mere existence of a

violation is not sufficient *ipso facto* to support the action; forbidden acts cannot be

relevant unless they cause private damages."); *Tom v. Hawaii Dental Serv.*, 606 F.

Supp. 584, 587 (D. Haw. 1985) (finding that plaintiffs lacked standing where

"pendent" injuries complained of did not "flow from price-fixing or from acts

done to further price-fixing"); *Zanakis-Pico*, 98 Haw. at 317, 47 P.3d at 1230

("False or misleading advertisements do their damage when they induce action

that a consumer would not otherwise have undertaken.  If a consumer can establish

a resulting injury, HRS § 480-13(b)(1) entitles him or her to the greater of

$1,000.00 or treble damages.").[23]

In the present case, individual reliance -- whether IAP purchasers

---

[23]  *Courbat v Dahana Ranch, Inc.*, 111 Haw. 254, 262, 141 P.3d 427, 435 (2006), does not hold otherwise.  *Courbat* simply held that HRS § 480-2 applies an objective test to determine whether a material representation, omission, or practice occurred which was likely to mislead reasonable consumers.  This case, however, involves individuals claiming damages under HRS § 480-13 predicated on alleged violations of HRS § 480-2.  Plaintiffs are thus required to meet both the objective standard of HRS § 480-2 *and* the requirements of HRS § 480-13.  The Hawaii Supreme Court's reasoning in *Courbat* does not in any way indicate otherwise; indeed, the *Courbat* plaintiffs sustained an economic injury sufficient to meet the damage element of HRS § 480-13, namely a prepaid horseback riding fee of $116.  *Id.* at 261, 434.  *Courbat* does not undermine, in this case, the need for Plaintiffs to prove causation and actual damages.

actually relied on Midland's allegedly misleading or fraudulent publications or omissions -- provides the crucial causal link between the alleged violation of HRS § 480-2 and the damages claimed under HRS § 480-13.  *Accord Homchick v. Allstate Ins. Co.*, 2005 WL 2671359, at *4 (W.D. Wash. 2005) (finding that under Washington law, "[i]n order to demonstrate the requisite causal link, plaintiffs must demonstrate their reliance upon the false advertisement in purchasing the defendant's goods or services.").  Proving individual reliance requires testimony and evidence as to whether each individual class member relied on Midland's statements,[24] which in turn requires an examination into the financial understanding and sophistication of each class member[25] -- precisely the type of individualized proof which may defeat class certification under Rule 23(b)(3).  *Compare Poulos v. Caesars World, Inc.*, 379 F.3d 654, 664-65 (9th Cir. 2004) (finding that the district court did not abuse its discretion in declining to certify a class action because "[c]ausation lies at the heart of a civil RICO claim. . . .  In

---

[24]  For example, in her deposition, Ms. Yamane admitted that she "wasn't paying too much attention because [she] left it up to [her] husband."  Yamane Dep., attached to Oliver Decl. Ex. A at 24-25.

[25]  The circumstances of the named Plaintiffs demonstrate some of the ways in which the individual background of the class members differ: Ms. Thornson holds a Master's degree and Mr. Yokoyama held a degree from Honolulu Business College while Ms. Yokoyama attended school through eighth grade and Mr. and Ms. Yamane did not receive formal schooling past middle-school but held income-producing property.

some cases, reliance may be a 'milepost on the road to causation.'  This case fits

that description to a tee.  The misrepresentations standing alone have little legal

significance.  To connect the dots between the bare allegations and the injury, the

class needs something more.  Here, reliance provides a key causal link . . . .")

(citations omitted) *with In re First Alliance Mortgage Co.*, 471 F.3d 977, 992 (9th

Cir. 2006) (affirming class certification and finding that common issues

outweighed individualized questions where the class members justifiably relied on

the representations of the loan offers and California law provided that "a

misrepresentation may be the basis of fraud if it was a substantial factor in

inducing the plaintiff to act . . . .") (citations omitted).

> *d.    Suitability claims must be determined individually*

Plaintiffs' Fourth Amended Complaint alleges that Midland's IAPs

are inherently unsuitable for seniors.  The court previously ruled that suitability

claims are inappropriate for class standing and Plaintiffs' allegation of "inherent"

unsuitability does not change this analysis.

When examining the cumulative impact of these four factors under

Rule 23(b)(3)'s predominance standard, the court finds that the proposed class

members' common experience -- that each received published materials from

Midland and purchased a Midland IAP -- does not overshadow the unique legal

and factual questions significant to each proposed class member's claim.  Indeed, the individual issues concerning each investor's reliance on Midland's alleged deceptive acts and individual issues concerning the actual damages affected by the proposed class members outweigh issues common to this case.  The court thus finds that the predominance requirement of Rule 23(b)(3) has not been met.

### 2.   *Superiority*

Rule 23(b)(3) also requires that a class action be superior to any other available form of adjudication.  Under Rule 23(b)(3)'s superiority standard, the court considers economies of time, effort and expense as to both the judiciary and the parties; whether a class action would promote uniformity of decisions as to questions of law or fact; whether a class action would protect the rights of persons who might not otherwise be able to bring individual claims; whether a class action would compromise the fairness or truth-seeking process of trying each member's claim individually; and what difficulties might be encountered in the management of the case as a class action.

Based on these factors, the court finds that a class action is not the superior method of adjudicating the Plaintiffs' claims.  First, given the many individual determinations that must be made, it is not clear that a class action would conserve the resources of the judiciary or the parties.  Instead, the court

believes that the highly individualized nature of the proof of damages in this case would only serve to confuse the jury if presented in the context of a class action.

Second, this is not a case where individuals lack incentive to pursue legal redress if they believe they were wronged by Midland or the individual brokers: The average senior's purchase of a Midland IAP exceeded $50,000 and HRS § 480-13(b) allows for treble damages and an award of attorneys' fees.

Third, some of the Plaintiffs may have individual claims against their independent brokers for receiving faulty advice. These claims can not be properly adjudicated within the class action framework.

Finally, denying class certification does not leave potential class members without redress. Aggrieved consumers have other, more preferable avenues of action, including filing an individual civil suit, filing a complaint with the Hawaii Insurance Division, or filing a complaint with Midland directly.

## V.  <u>CONCLUSION</u>

The court finds that the Plaintiffs have failed to meet their Rule 23(b)(3) burden of showing that common issues predominate and that a class action is a superior method of adjudication of the underlying claims. The court therefore REJECTS the Magistrate Judge's Findings and Recommendations granting Plaintiffs' Motion for Class Certification and therefore DENIES the

Motion for Class Certification.  The court ACCEPTS the Magistrate Judge's

Findings and Recommendations denying the Defendant's Motion to Strike Dr.

McCann's Testimony, and therefore DENIES the Motion to Strike Dr. McCann's

Testimony.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, June 21, 2007.



/s/ J. Michael Seabright
_____
J. Michael Seabright
United States District Judge

*Yokoyama et al v. Midland National Insurance Company*, Civ. No. 05-00303 JMS/KSC, Order
Accepting in Part and Rejecting in Part Magistrate Judge's Findings and Recommendations
Regarding Expert Testimony and Class Certification